Opinion
 

 KAUS, P. J.
 

 Appellant is the mother of Jacqueline H., a minor born on March 3, 1968. She appeals from a judgment of the superior court entered in June 1976 terminating her parental rights to the minor.
 
 [1]
 
 The grounds on which the superior court acted are those described in Civil Code sections 232, subdivisions (a)(1) and (a)(7).
 

 On appeal the mother raises three main issues: (1) the trial court should have appointed independent counsel to represent the minor, (2) the trial court erroneously admitted certain written reports; and (3) the evidence does not support the judgment.
 

 Facts
 

 An outline of the relevant facts is contained in a probation report filed December 1, 1975, the admissibility of which is conceded. (Civ. Code, § 233.) Herewith a summary of the report:
 

 Jacqueline lived with the mother from the time of her birth in March 1968 until February 1969 when she was placed in foster care. At that time the mother herself had been arrested for attempted assault on her own mother. Jacqueline again resided with the mother from May 1969 until April 1972 when she was again placed in a foster home. Jacqueline has not lived with her mother since that time. The natural father of the child,
 
 *811
 
 one Robert H. died in 1973. The mother has for some years been married to one John M.
 

 Jacqueline was declared to be a dependent child of the court under former Welfare and Institutions Code section 600, subdivisions (a) and (d) on May 9, 1972. That status has never changed. Contact between the mother and the minor has been token. The mother’s last visit had occurred in November 1974. In the past the mother “has displayed a very explosive behavior and used profane language; . . .” therefore, on one occasion the court ordered her to seek psychiatric care and visitation was suspended. The mother refused to get psychiatric help. At one point the mother had been in Metropolitan State Hospital for drug usage and was diagnosed as “schizophrenic and hypoglycemia.” She also has a history of drug abuse. A Department of Public Social Services (DPSS) worker had visited the mother in the fall of 1975 and suspected that the mother was continuing to use drugs. DPSS also “felt” that in the past the minor had been molested by John M. According to Jacqueline’s foster mother, the mother was last seen by her in March 1974. She has not sent the child any Christmas cards, birthday cards or any other holiday greetings. The last gifts given to Jacqueline were at Christmas 1973.
 

 The mother told the probation officer that she lived with her husband, Mr. M. who has a janitorial service for which she works as secretary and bookkeeper. She claimed that she had made efforts to regain custody of Jacqueline, but that the social workers had not been cooperative. In particular one Mrs. Davidson had “cut off visitations.” She claimed to have been to see a psychiatrist as ordered but was told “by the social worker that the letter they received was not what they wanted.” She claimed not to have taken any “dangerous drugs without prescription” since June 1969. She feels that both the social worker and the foster mother are hostile to her because while she was white, the child’s father was black.
 

 The probation officer evaluated the mother as “a very intelligent person” and found it inconceivable that she “would allow such a matter to go for a length of time without taking some action.” It was the probation officer’s “feeling that the child has been subjected to enough traumatic experiences and should be given this chance to live a normal life. She apparently has a very good potential home and is beginning to stabilize.”
 

 
 *812
 
 It seems to be understood that if the judgment appealed from is affirmed, proceedings leading to the adoption of Jacqueline by her present foster mother will be initiated.
 

 One of the two challenged reports was a report dated May 1972, signed by one Herbert W. Lambert, an investigator for the DPSS. This report was filed in connection with the then pending proceedings under former section 600 of the Welfare and Institutions Code. It makes the following points: Investigation has “revealed” that the mother has been “extremely heavily habituated to barbituates [¿7c] for a number of years” and, according to Mr. M., other DPSS workers, neighbors and police has been “unable to care for herself much less the minor.” During a prearranged visit by Lambert she was “totally incoherent with very slurred speech . . . stumbling. . . .” Further investigation showed that the family had been under the supervision of DPSS protective services for over three years, drug addiction being apparent. There is also a reference to the mother’s hospitalization which resulted in the diagnosis of “schizoprenia.”
 

 Lambert felt that the family had no “identifiable strengths.” Mr. M. himself was on aid to the totally disabled and “reportedly” also an addict. The minor was described as being “very shy, somber, fearful and withdrawn and possibly retarded as a function of her parents’ chronic social and emotional disfunctioning [sz'c].” She has shown remarkable improvement since being placed in a foster home. The mother’s basic attitude was “take my child—I don’t care.” While the mother was talking to Lambert she “hysterically explained that she was leaving her husband and in fact left.” Later that evening the police had to be called. The Lambert report then summarizes statements from several prospective witnesses.
 

 The other challenged report was prepared by the mother’s
 
 bete noire,
 
 Mrs. Davidson, and was dated December 19, 1974. It recommended continuation of the minor’s status under section 600. Jacqueline had progressed well with her foster family and expressed a desire to stay there. Mrs. Davidson acknowledged that the mother and Mr. M., had taken some positive steps toward improving their situation but felt that they were inadequate. She was much concerned about the “additional allegations regarding sexual abuse” and the many periods of separation between the mother and Mr. M. They had no realistic plan for looking after Jacqueline. Mrs. Davidson acknowledged that visitation had been suspended since November 1974, “awaiting confirmation of psychological and family counseling.”
 

 
 *813
 
 After these documents had been offered in evidence the mother testified. The mother’s testimony concerned itself to a great extent with her allegedly frustrating and frustrated efforts to obtain counseling which would enable her to resume visits with her daughter. The thrust of Mrs. Davidson’s testimony was that the mother’s efforts to obtain such counseling were not sincere and that greater efforts would have succeeded.
 

 Mrs. Davidson also testified to various contacts with Jacqueline. Jacqueline has “consistently stated her fears of her stepfather.” She did, however, express positive feelings toward her mother, at least “in the beginning stages.” Mrs. Davidson felt that both parents have serious personal problems, as well as a serious marital problem and that before the child could have a secure and stable life with them those problems would have had to be worked out. She felt that the therapy program was a key factor in the reunification of the family.
 

 Mr. M. testified. In essence he denied any problems between himself and Jacqueline. Mrs. Davidson, however, retook the stand to testify that Jacqueline’s feelings that she did not want to be living in a home with Mr. M. and did not want to visit with him, had strengthened. There was also testimony from one Deborah H. Smith, another case worker assigned to Jacqueline, who had had recent contacts with her and discussed the possibility of her living with her mother. Since July 1975 Jacqueline had maintained that she did not want to leave the foster home to live with her mother, however there was a slight change in attitude in November or December 1975. Until then Jacqueline had not objected to visits with her mother, but after she had met with her in court at about that time, she reported that it was unpleasant for her and that she did not want to see her mother again.
 

 Discussion
 

 The Child’s Right to Counsel.
 
 As the court explained in
 
 In re Dunlap
 
 (1976) 62 Cal.App.3d 428 at pages 437-440 [133 Cal.Rptr. 310], section 237.5 of the Civil Code has, since 1965, provided that in proceedings of this sort the trial court “may appoint counsel to represent the minor.” The court also held that while this provision obviously did not mandate the appointment of counsel in every case, “the burden of persuasion with respect to the trial court’s determination to appoint or deny the child independent counsel [must] be placed upon justifying the decision to deny counsel. Unless the burden is allocated in that fashion, there may
 
 *814
 
 well be no one involved, except in an adversary position, in the proceedings to assert the right of a child too young to assert it for himself.” In
 
 In re Richard E.
 
 (1978) 21 Cal.3d 349 [146 Cal.Rptr. 604, 579 P.2d 495] the Supreme Court appeared to embrace
 
 Dunlap
 
 wholeheartedly. “The rule we adopt of course requires counsel be appointed at the commencement of proceedings absent an immediate showing upon which the court can exercise its discretion against making an appointment.”
 
 (Id.,
 
 p. 355.) Having said that, however, the court distinguished the situation from the denial of the right to counsel in criminal and quasi-criminal situations and held that failure to appoint counsel for a minor in a section 232 proceeding “does not require a reversal in the absence of miscarriage of justice.” Applying that rule to the facts of
 
 Richard E.,
 
 the Supreme Court affirmed because the record disclosed “nothing which independent counsel for the minor might have done to better protect Richard’s interests.”
 
 (Id.,
 
 p. 355.)
 

 With all deference, we cannot avoid the suspicion that
 
 Dunlap
 
 and
 
 Richard E.
 
 in effect cancel each other out. The purpose of the preliminary showing mandated by
 
 Dunlap
 
 and approved by
 
 Richard E.
 
 is the ascertainment whether there is something which independent counsel for the minor might have done to protect the minor’s interests. If the preliminary showing is erroneously dispensed with, it is hardly surprising that the record contains no showing of what independent counsel might have done for the minor. Yet unless there is such a showing, the error is not reversible.
 

 Be that as it may we have to reconcile and live with
 
 Dunlap
 
 and
 
 Richard E.
 
 as best as we can. The solution lies perhaps in the consideration which triggered the
 
 Dunlap
 
 rule: that in many situations it might not be in the interests of any party to put forward considerations from which the best interests of the child might be determined. Or, to put the matter differently: are the best interests of the child likely to appear from the adversary clash before the court?
 
 Dunlap,
 
 which was a fight between a foster parent and the natural mother, in which each represented selfish interests, was not such a case.
 
 [2]
 

 Richard E.,
 
 in which the adversaries were the natural father and the Los Angeles County Department of Adoptions was. Obviously this case is more like
 
 Richard E.
 
 than
 
 Dunlap.
 
 Since no miscarriage of justice appears to have
 
 *815
 
 resulted from the failure to appoint counsel for the minor, the error is
 
 [3]
 

 The Challenged Reports.
 
 When counsel for the mother objected to the admission of the Lambert and Davidson reports, he did so “on the ground of hearsay and irrelevancy.” The court ruled that the reports would be received but that “any portions of either report which are only statements from third persons will be stricken.” It seems to us that the import of the court’s ruling was plain enough: it would receive the reports to the extent that they represented observations of the authors, including statements made by the mother (Evid. Code, § 1220) but would not consider, on their merits, hearsay statements made to the authors by third persons. In effect the reports were received as official records under section 1280 of the Evidence Code in connection with which it has been held that statements from third persons are inadmissible.
 
 (Hoel
 
 v.
 
 City of Los Angeles
 
 (1955) 136 Cal.App.2d 295, 309 [288 P.2d 989]; see e.g.,
 
 People
 
 v.
 
 Flaxman
 
 (1977) 74 Cal.App.3d Supp. 16, 20 [141 Cal.Rptr. 799].) The reports do, of course, contain a certain number of opinions and conclusions. This, however, does not affect the admissibility, only their trustworthiness. (Jefferson, Cal. Evidence Bench Book (Cont.Ed.Bar 1972) § 4.6.)
 
 [4]
 
 There is nothing in the record which would indicate that the trial court overstepped the limits of admissibility when it considered the reports. To be sure, there are certain borderline statements—e.g., Lambert’s enigmatic statement that investigation had “revealed” the mother’s involvement with barbiturates. If counsel had desired a specific ruling with respect to any such statement in either of the challenged reports, he should have asked for one.
 

 Sufficiency.
 
 Finally counsel attacks the sufficiency of the evidence to support the judgment.
 

 It seems clear to us that the record supports the finding under section 232, subdivision (a)(1), generally called “abandonment.” The mother cites
 
 In re George G.
 
 (1977) 68 Cal.App.3d 146, 162 [123 Cal.Rptr.
 
 *816
 
 201] for the proposition that a judicial taking of a child cannot constitute the necessary “leaving” of the child required by section 232, subdivision (a)(1). As we read
 
 George G,
 
 however, it did not purport to state so general a rule applicable to all situations where a child was initially removed from the home by judicial decree. As the mother herself realizes there are several cases where nonaction of the parent after a judicial decree removing the child may convert a “taking” into a “leaving.” (E.g.,
 
 In re Conrich
 
 (1963) 221 Cal.App.2d 662, 666-667 [34 Cal.Rptr. 658];
 
 In re Maxwell
 
 (1953) 117 Cal.App.2d 156, 165 [225 P.2d 87].)
 

 In this case the trial court found that the mother’s failure to engage in psychological and family counseling, which resulted in termination of visitation rights, and her token efforts to regain visitation rights indicated an abandonment of the child. We are bound to agree that the record supports the finding. As the probation officer found, the mother’s intelligence is simply not reconcilable with her minimal efforts to regain some measure of custody of her daughter if she really desired it. In reality the pattern that emerges is pretty obvious: that the mother is unwilling to lift a finger to regain custody of her daughter until she is faced with a moment of truth, when, to be sure, she will fight legal efforts to deprive her of her parental rights with tooth and nail, lapsing again into inertia and lethargy once the moment of crisis has passed.
 

 So much for section 232, subdivision (a)(1).
 

 With respect to section 232, subdivision (a)(7) the court made full and complete findings concerning the mother’s failure to provide a home, care and control or an adequate parental relationship for over two years, that it was beyond a reasonable doubt that this situation was not likely to improve in the future and, further, also beyond a reasonable doubt that return of the child to the mother would be detrimental to the child. Finally, the court found that an award of custody to a nonparent would be in the best interests of the child.
 

 The mother disputes these findings on what she calls the “clear, unrebutted testimony” of the case. She ignores, however, that her testimony did not have to be accepted by the trial court, that it was at odds with legitimate inferences which could be drawn from the other evidence in the case and that these inferences did support the findings and the judgment. In particular the mother’s submissions dodge a most
 
 *817
 
 delicate issue: regardless of what may or may not have taken place between Mr. M. and the minor, the latter’s fear of Mr. M. is a fact solidly proven in this proceeding. (Evid. Code, § 1250, subd. (a)(1).) As long as he was going to occupy the position of stepfather, the court was amply justified in finding that the mother was simply not about to provide an adequate home for the child.
 

 Affirmed.
 

 Ashby, J., and Hastings, J., concurred.
 

 Appellant’s petition for a hearing by the Supreme Court was denied August 29, 1979.
 

 [1]
 

 The matter has been before this court on a previous occasion when we dismissed the appeal for reasons found to be inadequate in
 
 In re Jacqueline H.
 
 (1978) 21 Cal.3d 170 [145 Cal.Rptr. 548, 577 P.2d 683]. The final disposition by the Supreme Court was to retransfer the case to this court with directions to determine the merits.
 

 [2]
 

 It was certainly inferable from the facts of
 
 Dunlap
 
 that the parties were not fighting over the minor, but about the public assistance money that came with the minor.
 

 [3]
 

 There is, as noted, some evidence in the record that the minor did not want to be reunited with her mother. The wishes of a seven-year-old minor are, however, hardly conclusive on the issue of her best interests. In any case, the fact that the minor was not represented by counsel of her own, did not prevent either side from producing any available witness who had relevant evidence to give, including, specifically, the minor.
 

 [4]
 

 The objection that the records were irrelevant was, of course, quite inappropriate.