[No. H003927. Sixth Dist. Mar. 29, 1989.]

ADOPTION OF MICHAEL D., a Minor.
S. ELISE D., Petitioner and Respondent, v.
STEVEN D., Objector and Appellant.

[No. H005140. Sixth Dist. Mar. 29, 1989.]

In re MICHAEL D., a Minor, on Habeas Corpus.

COUNSEL

Jan E. Burland and Michael A. Kresser, under appointments by the Court of Appeal, for Objector and Appellants.

Mark Portman and DiFranza & Portman for Petitioner and Respondent.

OPINION

BRAUER, Acting P. J.—The trial court found that Steven D. (Steven) had abandoned his son Michael for a period of one year within the meaning of

Civil Code[1] section 232, subdivision (a)(1) and ordered that his parental rights be terminated and that Michael be freed for adoption by his stepparent. In this appeal Steven raises the following claims: 1) The one-year period measuring abandonment should not have commenced until his paternity was finally adjudicated, since he was not until that time a "parent" as that word is used in section 232;

2) The court erred in failing to make an express finding that a continued relationship with him would be detrimental to the child;

3) The court erred in failing to find that there were no less detrimental alternatives to termination of parental rights;

4) Counsel should have been appointed to represent the child's interests; and

5) His attorney failed to develop a meritorious defense, thus depriving him of effective assistance of counsel.

Steven has also filed a petition for a writ of habeas corpus alleging ineffective assistance of counsel. We ordered that the writ petition be considered with the appeal. On the record on appeal, we will affirm the order of the trial court terminating parental rights. In regard to the writ petition, however, we have concluded that an evidentiary hearing is required in order to afford Steven a full and fair opportunity to present his claims on an adequate record. We will therefore issue an order, returnable before the Superior Court of the County of Santa Clara, that respondent herein show cause why the relief sought by Steven's petition should not be granted.

## BACKGROUND

S. Elise D. (Elise) and Steven met in 1974 and lived together off and on for six years. They were living together when Elise became pregnant. When she was four months pregnant they separated and moved back to their respective parents' homes, although they continued to see each other from time to time.

On July 25, 1980, Elise gave birth to a son, Michael. She put Steven's name on Michael's birth certificate.

Following Michael's birth, Elise went back to work and tried to enlist Steven's help with child care by dropping Michael off at Steven's parents'

---

[1] All statutory references are to the Civil Code unless otherwise indicated.

home. During these periods of "baby-sitting," Steven was often neglectful of Michael, at times to the point of endangering the child. Eventually, Elise made other arrangements for the child's care.

On September 29, 1981, Elise filed a complaint against Steven, alleging paternity and requesting child support and custody of Michael. She also sought a restraining order to prevent Steven from harassing her. Steven answered by denying paternity and requesting joint custody. Following mediation, Steven and Elise reached an agreement regarding visitation and support, the substance of which was contained in a temporary order entered December 7, 1981. Steven was awarded supervised visitation one day per week, with the supervisor to be approved by Elise, and he was to pay her $50 per month child support. Elise approved of Steven's parents or his sister as acceptable supervisors.

Several months later Steven was found to be in contempt of court on 13 counts of violating restraining orders. The prior order permitting Steven to contact Elise by phone to arrange for visitation was stricken; henceforth all visitation arrangements were to be made through Elise's attorney.

Steven's weekly visits with Michael diminished in frequency to once every six weeks or less in 1982 and 1983. In July of 1984, Steven's parents decided that they no longer wished to supervise the visits. They asked their son to find another supervisor. Steven's mother remembered talking to Elise about three possible alternate supervisors, none of whom was acceptable to Elise. Elise denied ever having been offered any alternate supervisors until over a year later.

As to support, Steven made several payments in 1982. In 1983, he made two payments. From September 1983 through November 1985, more than two years, he made no payments.

Meanwhile, on September 3, 1983, Elise married Randall L. (Randy). In late November of 1985, Elise and Randy decided to proceed with an action to have Randy adopt Michael. On January 17, 1987, Randy filed a petition for stepparent adoption pursuant to section 7017, subdivision (b).[2] Under that section an alleged natural father must be given notice of the proceedings, and Steven was so notified.

Steven answered by filing an action to establish paternity, thus abating the proceedings under section 7017. He also requested joint custody and

---

[2] On that same day Elise moved to have the 1981 action dismissed. That action was dismissed April 29, 1986.

increased and unsupervised visitation. On January 29, 1987, a judgment was entered declaring Steven to be the father of Michael, based upon blood tests.

Thereafter, Elise filed a petition to terminate Steven's parental rights under section 232, subdivision (a)(1), alleging that Steven had failed to communicate with or support Michael for more than one year, with the intent to abandon the child. Her petition also stated that her husband Randy intended to adopt Michael, and she asked for a determination that she be made the sole guardian for Michael until the petition for adoption was granted.

Trial took place September 24 and 25, 1987, before the Honorable R. Donald Chapman on the issue whether Steven had abandoned Michael within the meaning of section 232, subdivision (a)(1). That section provides that a minor is entitled to be declared free from the custody and control of a parent where that parent has left the child "in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent . . . with the intent . . . to abandon the child." The time period during which Elise alleged abandonment was between July of 1984, when Steven's parents withdrew as supervisors of visitation, to November of 1985, when she and Randy decided to file a petition for adoption and refused to allow Steven to visit Michael.

Judge Chapman filed a lengthy and thoughtful memorandum of decision, summarizing the evidence and the reasons for his decision. It was undisputed that Steven did not make any support payments during the relevant time. According to Elise and Randy, Steven did not even send Michael a birthday gift or card, or a Christmas present, or initiate any contact with him from July 1984 to November of 1985. At the time of trial Michael had not spent time with Steven for over three years. The probation officer assigned to the case conducted a private interview with Michael. Michael said that he did not want Steven to be his father. He said he was "scared" the last time he saw Steven because Steven "talked about weird stuff." In contrast, Randy taught him to play baseball and played fun games with him and he wanted Randy to be his dad.

The probation officer submitted two reports. The first was written before she was able to meet with Steven. It recommended granting the petition. After interviewing Steven she submitted a second report wherein she stated she found the issues confusing and recommended denial. The court gave little weight to the supplemental report, observing that her account of Steven's interview reflected various "gross exa[g]gerations" on his part.

According to Steven, after his parents withdrew as sponsors, he made numerous attempts to arrange visitation and offered the names of three possible supervisors. He claimed he made 50 to 100 calls to Elise's attorney, Mark Portman, during this time. Mr. Portman's records indicate only one call from Steven, in November of 1985, requesting a Christmas visit.

Steven testified that in July of 1984, he contacted Legal Aid with the specific purpose of obtaining legal assistance to reestablish visitation with his son. He filled out the necessary forms, but was informed no attorney was available at that time. Here Judge Chapman interrupted Steven's testimony to emphasize that he "consider[ed] that important." He then addressed Steven and his attorney: "I am suggesting that sounds to the Court like an independent source of objective physical evidence of no intent on his part to abandon his visitation rights or abandon his child. I would think that would be something that you both would want to follow up on."

After the trial was over, but before Judge Chapman issued his memorandum, Steven personally obtained a declaration from Mary Tapia, a clerk with Legal Aid. She stated that she remembered Steven calling the Legal Aid office many times during 1984, seeking legal assistance to enforce his visitation rights. Steven attempted to submit this declaration; however, no motion to reopen or for a new trial was made and the declaration was not received into evidence.

Judge Chapman found "with great reluctance" that Steven had abandoned Michael within the meaning of the law, observing that "[t]he taking of a child from the custody and control of a natural parent is most serious, and should only occur when the evidence of abandonment is clear and convincing." An order was entered granting the petition, declaring Michael free of the custody and control of Steven, and authorizing Elise and Randy to proceed with a stepparent adoption without Steven's consent.

## ISSUES

I. *Can Abandonment Be Established by Conduct Occurring Before Steven's Paternity Was Adjudicated?*

While the 1981 temporary order re visitation and child support constituted a preliminary finding of paternity (*Gadbois* v. *Superior Court* (1981) 126 Cal.App.3d 653 [179 Cal.Rptr. 19]), Steven's paternity was not formally established until January 29, 1987, as a result of his reverse paternity action. He seizes upon this date as the commencement of his "parenthood" for purposes of proving abandonment, arguing that since he was not legally a "parent" in 1984 and 1985, his behavior during that time period cannot be

used to support termination of parental rights in a section 232 proceeding. Elise argues that Steven should not be allowed to abandon his child, later establish himself as the father when adoption proceedings are commenced, and then play the system to forestall the adoption process indefinitely. Such a result would obtain here since she clearly cannot allege facts constituting abandonment *after* January 29, 1987, because Steven has since then been actively involved in a legal battle over his child. In support of their respective positions, both parties have engaged in a comparative analysis of the various statutory procedures available to free a child for adoption. In order to gain some perspective on the issue, we will do so also.

In California unwed fathers are divided into two categories—"natural" fathers and "presumed" fathers. A father is a presumed father when he meets any of the requirements of section 7004. In general that section reflects prior law under which a father could "legitimate" a child born out of wedlock. It applies to a father who has made efforts to establish some tie with the child in addition to the biological one: for example, he has married the child's mother, or attempted to marry her, or has taken the child into his house as his own. (§ 7004.) A father who, like Steven, does not qualify as a presumed father is a natural father.

The Legislature intended to accord different rights to presumed and natural fathers where adoption of the child is concerned. Not surprisingly, a presumed father has greater rights. An adoption can proceed only if his consent has been given or his parental rights have been formally terminated. Section 224 describes the procedure for terminating the parental rights of a presumed father in a case where the mother has custody and has consented to the adoption. Under that section the court must find that the father "willfully fail[ed] to communicate with and . . . support . . . the child when able to do so" for a period of at least one year.

A natural father, on the other hand, does not automatically have the power to withhold consent, although he does have the right to be heard with respect to the proposed adoption. (§ 7017, subds. (b) and (d).)

A natural father's rights are governed by the Uniform Parentage Act, section 7000 et seq. The sections relative to adoption were amended subsequent to the proceedings here in two pertinent respects, one procedural and one substantive. When Randy filed his adoption petition and gave the required notice to Steven, subdivision (c) of section 7006, provided that an action by the father to establish a parent/child relationship would suspend the adoption proceedings. Section 7006, subdivision (c) now provides that such an action is to be consolidated with pending adoption proceedings, and both matters decided under section 7017, subdivision (d).

Section 7017, subdivision (d) was also amended to enlarge the rights of the natural father. Formerly, if the father appeared and claimed parental rights, the court, upon determining that he was merely a biological rather than a presumed father, could simply order the adoption to proceed without his consent. Presently, section 7017, subdivision (d) requires that the court apply the best-interests-of-the-child test in determining whether the adoption should proceed. If the court finds an adoption is in the best interests of the child, the natural father's consent is not required and his parental rights are terminated.[3]

Finally, we come to section 232. That statute describes various circumstances under which a minor is entitled to be freed from parental custody or control. Subdivision (a)(1) requires the petitioning party to prove that the father has failed to support or communicate with the child for one year or more, with the intent to abandon the child. Section 232 provides that findings must be supported by clear and convincing evidence, whereas neither section 224 nor 7017 indicates a standard of proof.

With these statutes in mind, we return to Steven's argument. He contends that as of January 29, 1987, his status is that of a "legal" father. As such, he argues, his rights are defined by section 232 and may be terminated only under the standards expressed in that section. And his behavior may be scrutinized only after the date he became "legal."

No part of this theory holds water. First, why should Steven, who has only a judgment of paternity based upon blood tests, have greater rights than a father who has established family ties to the child either by marrying the mother or sharing a home with the child? The law reflects a policy that the extent of the father's rights is measured in large part by the degree to which he has undertaken responsibilities in raising the child. Steven has never had custody of Michael. He did not live with the mother at the time of Michael's birth and never received the child into his home. And the evidence summarized above illustrates the meager extent of his contributions to Michael's care and support.

---

[3]There is no question that the instant matter would have been confined to a section 7017 proceeding had the amended section 7006, subdivision (c) been in effect. Even before the amendment of section 7006, subdivision (c), however, a mother could file a petition under section 7017, subdivision (b) to terminate the parental rights of a natural father. Had Elise done so the matter would have been determined in accordance with section 7017, subdivision (d). As we note above, that section does not require the petitioner to prove that the father abandoned the child before the adoption can proceed. Consequently, the question addressed by the habeas corpus petition we discuss in part V, regarding counsel's failure to present evidence on the issue of intent to abandon, would not have arisen. It is not clear to us why Elise did not proceed in this fashion, rather than take on the heavier burden of proof imposed by section 232, subdivision (a)(1).

Second, section 232 does not define, or even refer to, the term "legal parent." Nor does it describe the class of parent to which it applies. Since it appears in a chapter entitled "Freedom from Parental Custody and Control," it may be inferred that it operates to terminate the rights of those parents who have, or at one time *had,* custody or control. This would not include Steven.

In short, we have been unable to find any authority for the proposition that the parental rights of a natural father, who is armed with virtually nothing but judicial proof of his biological relationship to the child, must be terminated only under section 232. And in any case, since section 232 provides the most protection possible to the parent, we fail to see how Steven has been prejudiced by the fact that the action against him proceeded under this section rather than section 224 or 7017.[4]

Finally, as Elise has argued, if Steven's theory were accepted, and his conduct prior to January 29, 1987, could not be used to show abandonment, he would essentially be immune to an action to terminate parental rights and consequently will have succeeded in thwarting the adoption process altogether. Such a result is of course totally at odds with the legislative scheme. (See, e.g., *In re Baby Girl M.* (1984) 37 Cal.3d 65, 72 [207 Cal.Rptr. 309, 688 P.2d 918].)

There is no unfairness to Steven in examining his conduct as a parent throughout the period of time when he contends he was attempting to assert his parental rights. He cannot have it both ways. The court did not err in basing its decision on evidence of his conduct during 1984 and 1985.

▮ II. *Did the Court Err in Failing to Make an Express Finding That Continued Contacts With Steven Would Be Detrimental to Michael?*

This question breaks into two parts: Was a finding of detriment required, and if so, can it be implied?

---

[4] At oral argument before this court Elise's attorney took the position that section 224, rather than 232, is the applicable statute. Under section 224 the adoption could proceed without the father's consent if the mother could show a willful failure on his part to communicate with and support the child for a period of a year. She needn't prove an intent to abandon, nor would she be burdened by the clear and convincing evidence standard of proof. But the argument is too late. She filed her action under section 232, subdivision (a)(1) and the court's decision was rendered pursuant to that section. Moreover, the evidence does not support a finding that Steven was a presumed father under any of the conditions set forth in section 7004, subdivision (a). Therefore, section 224, which provides the procedure for adopting a child "having a presumed father under subdivision (a) of Section 7004," does not apply to Steven.

Section 232, subdivision (a)(1) does not require that a finding of abandonment be accompanied by a finding that continued contacts with the abandoning parent would be detrimental to the child. That requirement has its provenance in section 4600 of the Family Law Act. Section 4600 sets forth the order of preference for custody awards in a family law proceeding: first to both parents, or either parent, then to persons in whose home the child has become established, then to others deemed suitable by the court. It then provides that "[b]efore the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child." (§ 4600, subd. (c).)

The question whether the detriment requirement of section 4600 applies to proceedings to terminate parental rights under section 232 is a moot one now. In 1988 the Legislature amended subdivision (d) of section 232 to provide that section 4600 "shall not apply to proceedings pursuant to this section." That amendment was made effective immediately, August 29, 1988, but not in time to apply to this trial, held the previous year.

Since the matter has been decided by the Legislature, we do not consider it productive to join in the debate whether the parental preference test of section 4600 should be applied out of the context of a family law proceeding. Suffice it to say that at the time of trial, two Supreme Court cases, *In re Carmaleta B.* (1978) 21 Cal.3d 482 [146 Cal.Rptr. 623, 579 P.2d 514], and *In re Richard E.* (1978) 21 Cal.3d 349 [146 Cal.Rptr. 604, 579 P.2d 495], had held that a finding of detriment was required before parents could be deprived of custody in section 232 proceedings. Under *Auto Equity* [5] we are bound by that precedent.

But we do not agree with Steven that an *express* finding of detriment is necessary in all cases. A court must address the essential findings required by section 4600 if requested by a party. (*Michael U.* v. *Jamie B.* (1985) 39 Cal.3d 787, 793 [218 Cal.Rptr. 39, 705 P.2d 362]; Code Civ. Proc., § 632.) In our case neither party requested a statement of decision. Moreover Judge Chapman's 11-page memorandum, in which he summarized the evidence of Steven's abandonment of Michael, was more than adequate to support a finding that continued contacts with Steven would be detrimental to the child. The court found there was "overwhelming evidence of Steven's indifference toward the child." Likening Steven's behavior to the parent in *In re Jacqueline H.* (1979) 94 Cal.App. 3d 808 [156 Cal.Rptr. 765], the

---

[5] *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].

court paraphrased from that case: "the pattern that emerges is pretty obvious: that the [father] is unwilling to lift a finger to regain [visitation] of [his son] until [he] is faced with a moment of truth, when, to be sure, [he] will fight legal efforts to deprive [him] of [his] parental rights with tooth and nail, lapsing again into inertia and lethargy once the moment of crisis has passed." And added to the father's indifference was the son's express desire to have Randy, and not Steven, as his dad.

Judge Chapman concluded it was "unlikely" that Steven would turn his life around and become a responsible father, and that Michael would face an "unpromising future" with Steven as his parent. Accordingly, Michael's best interests would be served by adoption, which would enable him to become a full-fledged member of a stable family unit. We deem these statements by the court to constitute the necessary findings. (*In re Richard E.,* *supra,* 21 Cal.3d 349, 356.)

■ III. *Did the Court Err in Failing to Make an Express Finding That There Were No Reasonable Alternatives to Termination of Steven's Parental Rights?*

Steven claims *In re Angelia P.* (1981) 28 Cal.3d 908 [171 Cal.Rptr. 637, 623 P.2d 198], is authority for the proposition that the court must specifically find no reasonable alternatives exist before it terminates a parent's rights in a section 232 proceeding. *Angelia* does not mandate such a finding. Rather that case held that the court should consider less severe alternatives which are designed to keep a family intact, bearing in mind that the primary intent of section 232 is to afford children a permanent and stable environment during their formative years. (*Id.* at p. 932.) Whether a termination proceeding should be delayed in order to explore possible alternatives is a decision within the discretion of the trial court. (*Ibid.*)

The court in *In re Rico W.* recently summarized the current state of the law in this regard: "We know of no mandate from our highest court requiring an *express* finding that termination of parental rights is the least detrimental alternative for the welfare of the children. . . . At most, it would appear the least detrimental alternative standard is but a 'more precise formulation' of the best interest of the child standard." (*In re Rico W.* (1986) 179 Cal.App.3d 1169, 1176 [225 Cal.Rptr. 472]; see also *In re Mark V.* (1986) 177 Cal.App.3d 754, 761 [225 Cal.Rptr. 460].)

IV. *Failure to Appoint Counsel to Represent the Minor.*

■ Section 237.5 sets forth the procedure regarding appointment of counsel in a section 232 hearing. Subdivision (a) of section 237.5 provides

that the court shall appoint counsel for the minor if, after considering the minor's interests, the court finds that those interests require protection by separate counsel.

The case of *In re Richard E., supra,* 21 Cal.3d 349, held that the trial court should appoint counsel for the child at the commencement of section 232 proceedings unless there is an affirmative showing that the child's interests will otherwise be protected.[6] In *Richard E.,* as in our case, there was no showing whatsoever on the issue of the need, or lack thereof, for counsel for the child. The court in *Richard E.* found that failure to appoint counsel in such a circumstance was error; however, the error did not require reversal of the judgment in the absence of a showing that the minor was prejudiced by the lack of independent representation. (*Id.* at p. 355.)

Steven argues that the child's voice was not heard in these proceedings, in part because the trial judge did not personally interview Michael, relying instead on the probation report in which Michael had expressed his desire to have Randy, and not Steven, as his dad. Randy and Elise, as well as Steven's parents, Dr. and Mrs. D., had heard Michael express himself in a similar vein. We acknowledge that the wishes of the child are not conclusive on the issue of the child's best interests. (*In re Jacqueline H., supra,* 94 Cal.App.3d 808.) But there is absolutely nothing in the record to suggest that Michael's interests were overlooked in this case. We conclude that Michael's rights were not prejudiced by the court's failure to appoint counsel to represent him.

V. *Ineffective Assistance of Counsel.*

Steven argues that his appointed counsel utterly failed to develop and present a meritorious defense to the allegation that he intended to abandon his child; consequently he did not receive effective assistance of counsel.

Ineffective assistance of counsel presents a cognizable claim of error on appeal from proceedings to terminate parental rights, since an indigent's due process right to counsel in such proceedings would otherwise be a hollow right. (*In re Christina P.* (1985) 175 Cal.App.3d 115, 129 [220 Cal.Rptr. 525]; *In re Ammanda G.* (1986) 186 Cal.App.3d 1075 [231 Cal.Rptr. 372].)

---

[6] In the event that a retrial of this matter becomes necessary, the court and counsel should be mindful of this rule of law.

The traditional test for ineffective assistance is two-part: 1) whether trial counsel failed to act in a manner expected of reasonably competent attorneys acting as diligent advocates; and 2) whether such failure deprived the defendant of a potentially meritorious defense, or whether it is reasonably probable that a determination more favorable to the defendant would have resulted but for counsel's failings (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 581-584 [189 Cal.Rptr. 855, 659 P.2d 1144].)

■ Where the factual basis for the claim rests in pertinent part on evidence not contained in the record on appeal, a habeas corpus proceeding is the proper vehicle to raise the issue. (*People* v. *Jackson* (1973) 10 Cal.3d 265, 268 [110 Cal.Rptr. 142, 514 P.2d 1222].)

■ With these principles in mind, we turn to the merits of Steven's claim.

It was only "with great reluctance" that the trial court found an abandonment within the meaning of the law. The crucial issue was whether Steven's total loss of contact with his child for over a year was the result of an intent to abandon him. ■ " ' "In order to constitute abandonment there must be an actual desertion, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the same." ' " (*In re Brittany H.* (1988) 198 Cal.App.3d 533, 549 [243 Cal.Rptr. 763], quoting *Guardianship of Snowball* (1909) 156 Cal. 240, 243 [104 P. 444].) "The controlling issue for a finding of abandonment is the subjective intention of the parent." (*In re Christina P., supra,* 175 Cal.App.3d 115, 131.)

■ Steven testified that he never intended to abandon Michael. He claimed that after his parents withdrew as supervisors, he tried to get legal help to enforce his visitation rights. Evidence that he had attempted to avail himself of legal assistance in order to reestablish contact with his son obviously would have been directly relevant on the issue of intent. Judge Chapman could not have made this more clear when he interrupted Steven's testimony and advised Steven's attorney that he considered such evidence important and worthy of further investigation. And again the next day during counsel's closing argument Judge Chapman asked him: "If I were to find that your client is not a credible witness, what evidence do you have of efforts on his part to assert his paternal natural rights during the period July 1984 through December 1985?" The only evidence before the court aside from Steven's testimony was that of his friend Valerie Watkins. Her testimony generally corroborated his.

Steven argues that the missing evidence was readily available. In a declaration attached to his habeas petition he states that he not only sought assistance from Legal Aid but also attempted to obtain private counsel. Letters from three attorneys are attached to his declaration and support his position. A declaration of Mary Tapia, an employee at Legal Aid, is also attached. She states that Steven called her office repeatedly during 1984, that he sought representation regarding his visitation rights, and that Legal Aid was not able to provide him with an appointment until late 1985. Finally, Steven's declaration states that he fully advised his trial attorney of his various efforts to regain contact with his son.

Trial counsel did not subpoena or obtain declarations from the people Steven claims he contacted. Nor did he seek a continuance to do so when the trial judge indicated such evidence would be important to the defense. No motion was made to reopen the proceedings, or for a new trial, when the declaration of Mary Tapia came to light through Steven's own efforts.

Without further evidence as to counsel's possible motives, we are compelled to reach the conclusion that a competent attorney acting as a diligent advocate would have made efforts to gather and present evidence corroborating his client's testimony, especially in light of the clear signal from the bench. And it is apparent that had such evidence been presented at trial, it is reasonably probable the outcome would have been different.

Elise argues that the writ petition does not establish a prima facie showing that Steven had a meritorious defense, for the reason that none of the parties contacted by Steven was able to state with certainty when the contacts occurred during 1984 and 1985. It is possible to draw the inference from the statements of these people that Steven contacted them before July of 1984 and after November of 1985. It is equally possible to draw the contrary inference, one favoring Steven. That is a matter which goes to the weight of the evidence; since we are not fact finders, it does not concern us here.

### DISPOSITION

The order granting the petition of Elise to declare her son, Michael, free of the custody and control of his father Steven is affirmed.

Let an order to show cause issue, returnable before the Superior Court of Santa Clara County, directing respondent herein, Elise, to show cause why

the relief sought by the petition of Steven for habeas corpus should not be granted.[7]

Each party to bear his or her own costs on appeal.

Capaccioli, J., and Premo, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 21, 1989.

---

[7] We express the hope that Judge Chapman, now retired, who is intimately familiar with this case, would consent to preside over any further proceedings.