[No. H007309. Sixth Dist. June 21, 1991.]

In re SHEREECE B., a Minor.
DEPARTMENT OF SOCIAL SERVICES FOR MONTEREY COUNTY,
Petitioner and Respondent, v.
DONALD W., Objector and Appellant.

COUNSEL

Catherine Fancher Campbell, under appointment by the Court of Appeal, for Objector and Appellant.

Albert H. Maldonado, Deputy County Counsel, for Petitioner and Respondent.

OPINION

CAPACCIOLI, J.—

*Statement of the Case*

Donald W., the alleged natural father of Shereece B., a minor, appeals from an order terminating his parental rights. (Civ. Code, § 238.)[1] He claims the court lacked jurisdiction to enter its order. He also claims that the order, if properly entered, violates his constitutional right to equal protection under the law. We find no merit to these claims and affirm the order.

*Facts*

On October 10, 1988, Sherry Sims abandoned Shereece and her two step-siblings at a day care home. On October 25, 1988, all three children were declared dependents of the court and placed in foster care.

In October 1989, a permanency planning hearing was held. Thereafter, the Department of Social Services for Monterey County (the County) initiated proceedings to terminate Sims's rights under section 232. Although 1988 AFDC (aid to families with dependent children) documents listed Donald W. as Shereece's father, his status was not formally discovered until November 1989, when a caseworker commenced a due diligence search.

On January 19, 1990, the County filed a petition under section 7017 to terminate Donald W.'s parental rights, if any. The petition noted the proceedings against Sims and alleged that Shereece had no presumed father as defined by section 7004.[2] However, it alleged that Donald W. and Sims agree that he is her natural father.

---

[1]Unless otherwise specified, all further statutory references are to the Civil Code.

[2]Under Section 7004, a man is presumed to be the father of a child where the child (1) is born by a wife cohabitating with her husband, who is not impotent or sterile (Evid. Code,

Prior to the hearing, the court terminated Sims's parental rights.[3]

At Donald W.'s section 7017 hearing on May 9, 1990, Christine Lerable, the caseworker, testified that in November 1989, Donald W., who was incarcerated in a Missouri prison, responded to her letter informing him of a proceeding to terminate his parental rights. He informed her that he was already in prison when he first heard Sherry was pregnant with Shereece. However, he had no idea Shereece had been abandoned and placed in foster care. He suggested that his parents could care for Shereece.

Thereafter, Donald W. wrote Lerable opposing the termination of his parental rights and requesting appointment of counsel. In December 1989, he called Lerable to verify her receipt of his letter. He said he wanted to keep Shereece within his family and wanted to talk to his parents about her. However, he did not give Lerable their names or address.

Lerable also testified that to her knowledge, Donald W. has never married or attempted to marry Shereece's mother and has never had contact with, attempted to write or send gifts to, attempted to provide support for, or even seen Shereece.

Finally, Lerable testified that it would not be in Shereece's best interests to be placed with Donald W. or his parents because (1) she has a significant relationship with her stepbrother, with whom she lives; (2) she has "a lot of issues about trusting adults and abandonment" and even though she is only four, "she's been in counseling for a year to deal with some of these issues"; (3) she has a trusting relationship with her new family; and (4) it would be detrimental to disrupt her developmental progress.

The court found by clear and convincing evidence that Donald W. had no contact or relationship with Shereece, that he made no efforts to maintain a relationship, and that he was presently and for the forseeable future unable to provide any type of care or emotional support for her. The court further found that Shereece was four years old, had emotional problems that needed immediate attention, and that Donald W.'s parents had no relationship with

§ 621); (2) is born during marriage (§ 7004, subd. (a)(1)); (3) is born during an attempted marriage (§ 7004, subd. (a)(2)); is born before a marriage or attempted marriage (§ 7004, subd. (a)(3)); (4) is received into the man's home and held out as his natural child (§ 7004, subd. (a)(4)); and (5) is "born and resides in a nation with which the United States engages in an Orderly Departure Program or successor program" and the man "acknowledges that he is the child's father in a declaration under penalty of perjury, as specified in [the Code of Civil Procedure]." (§ 7004, subd. (a)(5).)

[3]We have taken judicial notice of the trial court's March 6, 1990, order that freed her children from Sims's custody and control and referred them to the County adoption agency for permanent placement. (Evid. Code, § 452, subd. (d)(1).)

her. The court concluded that stability and termination of Donald W.'s parental rights was in Shereece's best interest.

DISCUSSION

*I. Jurisdiction to Terminate Parental Rights*

■ Donald W. contends that the trial court lacked jurisdiction to terminate his parental rights. ■■■ He claims to terminate his parental rights as a nonpresumed, i.e., natural[4], father under section 7017, the County had to plead and prove that Sims actually signed formal relinquishment or consent documents or will do so. Since it is undisputed that she did not do so, he argues that section 7017 was inapplicable.

■ According to Donald W., the sole purpose of section 7017 is to enhance the power of a custodial mother to place her child for adoption. The statute does so by allowing termination of a natural father's parental rights simply upon proof that adoption is in the child's best interests. It follows, however, that where a custodial mother has not voluntarily consented to adoption, a natural father's biological relationship with the child is entitled to greater protection and may only be terminated under section 232, which, in essence, requires proof that a parent is unfit.[5]

The language of subdivision (b) of section 7017 does not support Donald W.'s position. It provides, in relevant part, "If a mother relinquishes for, consents to, or proposes to relinquish for or consent to the adoption of a child who does not have (1) a presumed father under subdivision (a) of Section 7004 or (2) a father as to whom the child is a legitimate child under prior law of this state or under the law of another jurisdiction, *or if a child otherwise becomes the subject of an adoption proceeding and the alleged father, if any, has not, in writing, denied paternity, waived his right to notice, voluntarily relinquished or consented to the adoption,* the agency or person to

---

[4] "A natural father is one who has been found to be the biological father but not a presumed father." (*In re Baby Girl M.* (1984) 37 Cal.3d 65, 72, fn. 5 [207 Cal.Rptr. 309, 688 P.2d 918]; *Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 790, fn. 1 [218 Cal.Rptr. 39, 705 P.2d 362].)

[5] Section 232 permits termination of parental rights for child abandonment (§ 232, subd. (a)(1)), cruelty or neglect (§ 232, subd. (a)(2)), depravity or alcohol and/or substance abuse (§ 232, subd. (a)(3)), conviction of a felony (§ 232, subd. (a)(4)), developmental disability or mental illness (§ 232, subd. (a)(5)), mental disability (§ 232, subd. (a)(6)), failure to reunify with a child previously removed from custody and present and future ability to maintain adequate parental relationship (§ 232, subd. (a)(7)), and/or sexual or physical child abuse or other conduct for which reunification services for the parent and dependent minor services need not be provided (§ 232, subd. (a)(8)).

whom the child has been or is to be relinquished, or the mother or the person having custody of the child, shall file a petition in the superior court to terminate the parental rights of the father . . . ."[6] (§ 7017, subd. (b), italics added.)

The above emphasized language, which Donald W. omits from his brief, refutes his view that termination of rights under section 7017 always requires proof that a custodial mother has consented or will consent to adoption. This language expressly contemplates and authorizes such termination *whenever* the child is the subject of an adoption proceeding and is sufficiently broad to encompass a situation where a child becomes the subject of an adoption proceeding after the court has terminated the mother's parental rights and referred the child to an adoption agency for permanent placement.

Donald W.'s reliance on *In re Baby Girl M.*, *supra*, 37 Cal.3d 65, *Adoption of Barnett* (1960) 54 Cal.2d 370 [6 Cal.Rptr. 562, 354 P.2d 18], *Adoption of Driscoll* (1969) 269 Cal.App.2d 735 [75 Cal.Rptr. 382], and *Arnold* v. *Howell* (1950) 98 Cal.App.2d 202 [219 P.2d 854] is also misplaced. He concedes none of these cases addressed the specific issue raised here. And we find in them no support whatsoever for his position.

We note the phrase "otherwise becomes the subject of an adoption proceeding" suggests that termination may not proceed unless and until a formal adoption proceeding has actually commenced. However, the purpose of severing parental rights is to pave the way for permanent adoption. (See *In re Laura F.* (1983) 33 Cal.3d 826, 837 [191 Cal.Rptr. 464, 662 P.2d 922]; 10 Witkin, Summary of Cal. Law (9th ed. 1989) Parent and Child, § 182, p. 231.) Moreover, the legal relationship between parents and their child must be severed one way or another *before* the placement of a child for adoption. (Cal. Code Regs., tit. 22, § 35031, subd. (a).) Consequently, to require the actual commencement of an adoption proceeding before termination may occur under section 7017 would appear to create an unnecessary, purely

---

[6]Subdivision (d)(2) of section 7017 provides, in relevant part, "If the natural father or a man representing himself to be the natural father claims parental rights, the court shall determine if he is the father. The court shall then determine if it is in the best interest of the child that the father retain his parental rights, or that an adoption of the child be allowed to proceed. The court, in making that determination, may consider all relevant evidence, including the efforts made by the father to obtain custody, the age and prior placement of the child and the effects of a change of placement on the child. If the court finds that it is in the best interest of the child that the father should be allowed to retain his parental rights, it shall order that his consent is necessary for an adoption. If the court finds that the man claiming parental rights is not the father, or that if he is the father it is in the child's best interest that an adoption be allowed to proceed, it shall order that the person's consent is not required for an adoption; such a finding terminates all parental rights and responsibilities with respect to the child. Section 4600 does not apply to this proceeding. Nothing in this section changes the rights of a presumed father."

procedural prerequisite. On the other hand, where there is no presumed father, it is reasonable to view a child, who has been referred to an adoption agency after his or her custodial mother's rights have been terminated, as having "otherwise become[] the subject of an adoption proceeding." (§ 7017, subd. (b).)

In any event, we agree with the County, that under section 7006, subdivision (c), the court properly may terminate a natural father's parental rights before the formal commencement of an adoption proceeding.

Subdivision (c) of section 7006 provides, in relevant part, "An action to determine the existence of the father and child relationship with respect to a child who has no presumed father . . . may be brought by . . . the State Department of Social Services . . . . Such an action shall be consolidated with a proceeding pursuant to subdivision (b) of Section 7017 if a proceeding has been filed under Section 7017. *The parental rights of the alleged natural father shall be determined as set forth in subdivision (d) of section 7017.*" (Italics added.)

Here, the County alleged and sought a determination that Donald W. was Shereece's natural (but not presumed) father, that is, to establish the existence of a parent and child relationship between them. It further sought an order terminating his parental rights. Donald W. opposed the petition, implicitly claiming parental rights of some sort. Under the circumstances, section 7006, subdivision (c) authorized, indeed, directed, the court to determine his rights as an alleged natural father according to the provisions of section 7017, subdivision (d). As noted above (see fn. 6, *ante*, p. 619), this subdivision requires the court first to determine whether the alleged natural father is the child's natural father and then to determine whether it is in the child's best interest for the natural father to retain his parental rights or have them terminated so as to permit an adoption to proceed.

Donald W. claims that since the County's petition was filed under section 7017 rather than section 7006, the provisions of the latter section are inapplicable. We find no merit to this claim.

Although the County denominated its pleading, "PETITION TO TERMINATE PARENTAL RIGHTS OF ALLEGED NATURAL FATHER [Civ. Code, § 7017]," it sought a formal determination of the existence of the relationship of natural father and daughter between Donald W. and Shereece. Thus, the pleading in substance triggered the provisions of section 7006. In the absence of a claim that the caption on the County's pleading misled Donald W. to his detriment, we consider the County's failure expressly to cite section 7006 irrelevant.

■ Donald W. next claims that the sole purpose of section 7006 is to determine whether or not a paternal biological relationship exists. Thus, if the County is deemed to have brought the action under section 7006, the court still was not authorized to terminate his parental rights. He argues that the determination of his parental rights "as set forth in subdivision (d) of section 7017" (§ 7006, subd. (c)) is authorized only where a section 7006 action is consolidated with a separate section 7017 action to terminate parental rights. We disagree.

The last sentence of section 7006, subdivision (c), requires that the alleged natural father's parental rights be determined pursuant to section 7017. This directive is neither expressly nor grammatically connected to the previous sentence requiring the consolidation of section 7006 and section 7017 actions. Rather, it stands independent of the previous sentence and applies regardless of whether a section 7017 action has been consolidated. Thus, where the County seeks a determination of biological parentage and the rights and obligations attendant thereto, it may also seek the termination of those rights in the same proceeding.

This conclusion finds support in section 7010, which provides, among other things, that the judgment or order determining the existence or nonexistence of the parent and child relationship may contain "any other provision directed against the appropriate party to the proceeding, concerning . . . any other matter in the best interest of the child." (§ 7010, subd. (c)(1).)

We further observe that subdivision (a)(1)(C) of section 35031 of title 22 of the California Code of Regulations requires the termination of parental rights before the placement of a child for adoption unless the child has been placed with approved prospective parents and "[a]n action under Civil Code Sections 7017 *or 7006 to terminate the parental rights of an alleged natural father is pending.*" (Italics added.)

## II. *Denial of Equal Protection*

### *Presumed vs. Natural Fathers*

■ Donald W. contends that the court's order terminating his rights deprived him of equal protection under the law. He asserts that section 7017, which permits the termination of a *natural* father's parental rights, and section 224, which permits the termination of a *presumed* father's rights, represent a two-tiered hierarchy of proof, with a greater level of proof necessary to terminate the parental rights of a presumed father. He claims that both statutes require maternal consent for an adoption. He concedes that

the statutes properly discriminate between presumed and natural fathers where a custodial mother has consented to adoption. However, he argues that in the absence of maternal consent, the rights of a presumed father may be terminated only under the more stringent requirements of section 232, whereas in this case, the court terminated his rights with only the minimal showing required under section 7017. He claims that "[n]o difference of significance will exist between these fathers, for in neither case will the mother's consent to an adoption be demonstrated to the court." Consequently, he claims that the distinction created by the trial court between presumed fathers and natural fathers where there is no maternal consent to adoption is irrational and unconstitutional. We are unpersuaded.

The Legislature has distinguished between presumed and natural fathers, according presumed fathers greater rights than natural fathers. (§ 7004.) A presumed father is entitled to custody, and where adoption is concerned, his consent or the formal termination of his rights for willful failure to communicate is required. (*In re Baby Girl M., supra,* 37 Cal.3d 65, 71-72; *Adoption of Michael D.* (1989) 209 Cal.App.3d 122, 130-131 [256 Cal.Rptr. 884].) A natural father, on the other hand, is neither entitled to custody nor automatically able to withhold consent to an adoption. (*Ibid.*)

The Legislature's distinction is based on the difference between a presumed and natural father's parent-child relationship and as such does not violate principles of due process and equal protection. (*W. E. J. v. Superior Court* (1979) 100 Cal.App.3d 303, 314-315 [160 Cal.Rptr. 862], disapproved on other grounds in *In re Baby Girl M., supra,* 37 Cal.3d 65, 72; *Adoption of Marie R.* (1978) 79 Cal.App.3d 624, 629 [145 Cal.Rptr. 122]; *In re Tricia M.* (1977) 74 Cal.App.3d 125, 130-136 [141 Cal.Rptr. 554].)

Moreover, the distinction exists regardless of whether a mother consents to adoption or has her parental rights involuntarily terminated. Consequently, if, as Donald W. concedes, the distinction is proper where a custodial mother voluntarily consents to adoption, then we can find no reason the Legislature may not also make this distinction where a custodial mother's parental rights have been involuntarily terminated so as to free her child for adoption. In short, the issue of maternal consent is irrelevant to the otherwise proper legislative distinction between presumed and natural fathers.

### Natural Fathers vs. Natural Fathers

■ Donald W. also claims the trial court created an unreasonable distinction between natural fathers whose rights are vulnerable to termination under section 7017 and those facing the same challenge under Civil Code

section 232. However, in light of our conclusion that sections 7006 and 7017 provide the procedure for termination of an alleged natural father's rights, with or without maternal consent or the pendency of a formal adoption proceeding, we find this claim meritless. Simply put, a natural father's parental rights need not be terminated under section 232, unless and until he demonstrates a parental status greater than that of alleged natural father.

### Natural Mothers vs. Natural Fathers

■ Donald W. contends that in terminating his parental rights without first finding that the failure to do so would be detrimental to Shereece, the trial court wrongfully discriminated against him because such a finding was required before the court terminated Sims's parental rights under section 232. We disagree.

Statutes which distinguish between mothers and fathers who are similarly situated violate principles of equal protection. (See *Lehr* v. *Robertson* (1983) 463 U.S. 248, 267 [77 L.Ed.2d 614, 630, 103 S.Ct. 2985].)

In *Caban* v. *Mohammed* (1979) 441 U.S. 380 [60 L.Ed.2d 297, 99 S.Ct. 1760], the court held that a law granting the right to veto an adoption to an unwed mother but not an unwed father *who had lived with the mother and their two children for several years* violated his right to equal protection. The two unwed parents were similarly situated, and the gender-based distinction between them was not substantially related to the state's interest in providing adoptive homes for illegitimate children. (*Id.* at p. 391 [60 L.Ed.2d at pp. 306-307].) The court carefully distinguished the rights of the unwed father who had lived with the mother and his children from those of the father of a newborn child. (*Id.* at p. 392 [60 L.Ed.2d at p. 307].)

However, where unwed parents are not similarly situated, the state properly may distinguish between them. For example, in *Lehr* v. *Robertson, supra*, 463 U.S. 248, 267 [77 L.Ed.2d at p. 630], an unwed father had not lived with the mother or their daughter after her birth, never provided financial support, and never sought to marry the mother. (*Id.* at p. 252 [77 L.Ed.2d at pp. 620-621].) The mother commenced an adoption action, and he filed a petition to establish his paternity, support obligation, and visitation rights. The adoption was completed without notice to him. The court rejected his due process claim based on lack of notice because a putative father registry would have provided notice if he had availed himself of it. (*Id.* at pp. 256-265 [77 L.Ed.2d at pp. 623-629].)

The court further held that his due process interest based on the biological link to his child did not merit heightened constitutional protection where he

did not demonstrate a full commitment to the responsibilities of parenthood by coming forward to participate in rearing his child. (463 U.S. at p. 261 [77 L.Ed.2d at p. 626].) "The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie." (*Id.* at p. 262 [77 L.Ed.2d at p. 627].)

Finally, the court rejected the father's equal protection claim because he and the mother were not similarly situated. Unlike the parents in *Caban*, who were similarly situated in that they both lived together with their children for several years, the mother in *Lehr* had a "continuous custodial responsibility for [the child]" but the father "never established any custodial, personal, or financial relationship with her." (*Lehr, supra*, 463 U.S. at p. 267 [77 L.Ed.2d at p. 630].) "If one parent has an established custodial relationship with the child and the other parent has either abandoned[] or never established a relationship, the Equal Protection Clause does not prevent a State from according the two parents different legal rights.[]" (*Id.* at pp. 267-268 [77 L.Ed.2d at pp. 630-631].)

In this case, Donald W. and Sims are also not similarly situated. Sims had a custodial relationship with Shereece until it was involuntarily severed. Donald W. apparently learned Sims was pregnant with Shereece while he was in prison. The record does not disclose whether he made any attempt to communicate with Sims before or after Shereece was born. However, it is undisputed that he has never had or sought to have a relationship of any kind or even contact with Shereece prior to the commencement of the action to terminate his rights, at which time Shereece was four years old.

In light of *Caban* and the circumstances of this case, we conclude that although Donald W. was treated differently than Sims, he was not deprived of equal protection under the law.

The fact that he was incarcerated prior to and after Shereece's birth does not convince us otherwise. He had reason to know that he might be a father and apparently made no attempt to determine whether Sims had given birth. Moreover, he had the opportunity to explain his situation and convince the court not to terminate his parental rights.

The judgment is affirmed.

Agliano, P. J., and Bamattre-Manoukian, J., concurred.