Filed 7/21/16  Adoption of D.R. CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Adoption of D.R., a minor. | |
| J.N., et al.,<br><br>        Plaintiffs and Respondents,<br><br>v.<br><br>D.R., et al.,<br><br>        Defendants and Appellants. | A141387<br><br>(Sonoma County<br>  Super. Ct. No. SFL63237) |

D.R. and S.S., the biological parents of D.R., appeal from an amended and final order of the superior court, filed on January 23, 2014, granting a Family Code [1] section 7822 petition filed by the child's guardians to declare the child free from parental custody on the ground of abandonment and to terminate parental rights so that the guardians can adopt the child.  The parents challenge the order on various grounds, none of which warrants reversal.  Accordingly, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

**I.    Background**

D.R. (father) and S.S. (mother) are the biological parents of D.R. (the child) born in December 2010.  In January 2011, the parents and the child moved into an apartment rented by the child's paternal aunt.  Sometime in March 2011, mother and the child

---

[1]      All further unspecified statutory references are to the Family Code.

1

moved into the home of A.N. and J.N., the child's guardians, and the child has lived with the guardians since that time.[2]

In January 2012, the guardians took the child to visit with the child's paternal relatives. However, three or four days into the visit, father contacted the guardians and informed them he was keeping the child. Father kept the child until the child got sick and was hospitalized. When mother learned of the child's hospitalization, mother successfully secured an emergency protective court order against father. On February 14, 2012, the court granted mother's ex parte request for temporary sole legal and physical custody of the child; the court ordered that father was not to have visitation at that time.[3] Immediately following the child's discharge from the hospital in February 2012, mother and the child returned to the guardians' home. Mother remained there for several days and then moved out, leaving the child with the guardians with no mention as to when she would return for the child. From February 2012 to the end of June 2012, the guardians heard from mother sporadically and mother occasionally saw the child. At the end of June 2012, the mother contacted the guardians and she asked for custody of the child. On July 1, 2012, mother told the police that the guardians had kidnapped the child and were keeping the child from her. After a police investigation, mother was arrested on outstanding warrants and the child was allowed to remain in the care of the guardians, who were advised to seek legal guardianship of the child.

On July 2, 2012, the guardians filed a petition for permanent legal guardianship of the child. The next day, the court granted the guardians' ex parte request for letters of temporary legal guardianship of the child. On August 1, 2012, the guardians and parents appeared in court, at which time the parents requested visits with the child. The guardians opposed the parents' request. The court found there was insufficient

---

[2]      Mother lived intermittently in the guardians' home from March 2011 to the beginning of October 2011. Mother permanently moved out of the guardians' home in the beginning of October 2011, leaving the child in the care of the guardians.

[3]      On April 17, 2012, the family court dropped the matter from its calendar and maintained in full force and effect its earlier order of February 14, 2012, as mother informed the court that father was incarcerated at that time.

information to change the status quo, denied the parents visits at that time, and the temporary guardianship was extended until the hearing for permanent guardianship.

On September 12, 2012, there being no opposition filed to the court's tentative ruling, the court granted the guardians letters of permanent legal guardianship of the child. The next day, mother filed a petition to terminate the permanent legal guardianship and sought an order granting legal guardianship of the child to J.S.B., the child's paternal grandmother. On October 10, 2012, there being no opposition to the court's tentative rulings and no appearances by any party, the court adopted its tentative rulings and denied mother's petition for termination of the guardians' permanent legal guardianship. At a hearing on October 31, 2012, the court approved the parties' agreement allowing the parents limited weekend visits with the child at the home of J.S.B. In December 2012, the guardians asked to change the visitation agreement to supervised visits every other Saturday from 9 a.m. to 5 p.m., which was opposed by the parents and J.S.B. On December 19, 2012, after the parties were unable to reach an agreement, the court modified its previous visitation order in the child's best interests, and granted the guardians' request to limit visits to every other Saturday but did not impose a supervision requirement.

## II. Current Trial Court Proceedings

### A. Background

On May 30, 2013, the guardians filed this section 7822 petition to declare the child free from parental custody on the ground of abandonment and to terminate parental rights so that the guardians could adopt the child.[4] In support of the petition, the guardians alleged, among other things, that for a period of more than two years, mother had made only token provisions for financial support of the child while the child was in the guardians' care, and father had made no provision for the financial support of the child since the child's birth. The guardians further alleged that the child was bonded to the

---

[4] Following the filing of the section 7822 petition, the guardians filed an application in the guardianship proceeding seeking to suspend the parents' visits with the child. The court denied the guardians' request and continued the parties' visitation schedule.

3

guardians and their two other children, and the requested adoption was in the child's best interests.

On July 11, 2013, the parties appeared in court where the parents opposed the guardians' section 7822 petition. The court appointed counsel for the parents and separate counsel for the child. The court also ordered that the child was to remain in the guardians' custody, and that visits between the parents and the child were to be supervised by either the guardians or by Legal Services Foundation, with the parents to pay any costs of visitation.

On July 18, 2013, Richard Wishnak, a family court services evaluator, filed a report concerning the circumstances of the parents, the guardians, and the child, including the parents' known criminal records based on information from both the guardians and "CLETS," the guardians' description of the parents' relationship, and the guardians' reasons for requesting termination of parental rights. Wishnak recommended that if the legal requirements of the section 7822 petition were met, the court should conclude it was in the child's best interests to be free from parental custody.

**B.      Trial Proceedings on Guardians' Section 7822 Petition**

The court adjudicated the guardians' section 7822 petition at a six-day trial held over the course of three months from August 20, 2013, and concluding on November 20, 2013. Before the commencement of testimony, the trial court ruled it would take proof regarding parental abandonment of the child, followed by a tentative ruling on the issue of abandonment. Then, if necessary, the court would allow the parties to present evidence on the issue of whether termination of parental rights would be in the child's best interests. Additionally, pursuant to the parties' stipulation, the court took judicial notice of the guardianship court file regarding the child.

**1.      Evidence of Parental Abandonment of the Child**

The court heard testimony from the child's parents, the child's guardians, and the child's paternal grandmother J.S.B., on the issue of parental abandonment of the child.

### a. Father's Testimony

Father had known mother since December 2009 and had "a constant relationship" with her for almost four years. Mother got pregnant with the child in March 2010, and the parties made plans to get an apartment and live as a family. During the pregnancy, the parents separated "for a little while." Towards the end of the pregnancy, mother met the guardians who were helping her. The guardians took mother to the hospital on the day of the child's birth in December 2010. Father first saw the child in the hospital the next day. Father did not pay for any prenatal care or hospital services; however, he did sign a voluntary declaration of paternity.

In January 2011, the parents and the child moved into an apartment. Father provided as much financial support as he could at that time. He did not recall how much money he made in 2011 "but [he] was okay;" he was not getting a pay check, but he was getting paid "under the table." Mother was receiving public assistance. Father and mother paid rent to the child's paternal aunt. The family also received financial support from the child's paternal grandmother J.S.B.

Father initially testified he did not know how long he resided with mother and the child; "probably like four, five months or something, six months." After looking at a calendar for 2011, father remembered that after the child's birth, mother and the child stayed with father "for like three or four months," and then mother left "and was gone for like three or four months." According to father, one day mother took the child to the guardians' home for a visit and mother never came back. He initially testified he and mother did not split up because they had problems. However, on further questioning, he testified that mother and the child had moved out because he guessed there were differences between the parents "obviously." Father did not know exactly where the mother and the child went after they left. He "never met [the guardians] 'until [he] came to the hospital when [the child] was born, after [the child] was born a day or two after [the child] was born.' " When asked if he had intended to have the guardians take care of [the child] permanently, father replied, ". . . I never told her or anybody that it was okay for anybody to take care of my [child]. That's what the problem is. [¶] I never got a

5

chance myself to take care of [the child]. I never gave up custody or rights or wanted anybody to take care of [the child]."

After mother and the child moved, father stayed in contact with mother because he wanted to know about the child. Father did not provide financial support for the child because the child "wasn't around a lot," and "they always told [him] they didn't need anything from [him]." Mother never asked father for any money. Father never received any verbal or written requests for money from the guardians. Nor did father offer the guardians any money because he "never talked to them like that," they did not have a relationship, and he did not talk to them on the telephone at all. Regarding visitation, father did not contact the guardians to arrange visits. Either the child's paternal grandmother or the child's paternal aunt contacted the guardians to arrange a visit. Alternatively, father would call the child's mother because he felt that since mother had taken the child, she should be able to bring the child to father to visit. Father never had a conversation with the guardians about the child's health issues or treatment for any health issues. Once mother and the child moved, father did not see mother "that much" because he did not think that she wanted him around.

Father initially testified that after mother and the child moved, father did not see the child for a couple of months. Father remembered there were "a lot of gaps" in when he saw the child. He later testified he made efforts to see the child. According to father from April 2011 through September 2011, he saw the child between seven to nine times. Father also described a three-day visit with the child in early 2011. Father did not know the dates of visits, but he knew he had seen the child "a whole bunch of times." During 2011 the child had visits with the child's paternal relatives two or three times a month. Each visit was for one or two days. After March or April 2011, father was able to visit with the child at least twice a month at the homes of the child's paternal relatives, except when father was incarcerated in jail. Father initially testified he was not sure he was in jail at any time in 2011. He thought he had been in jail in 2012 on two occasions for a total of four months for parole violations. Father later testified that during the period

6

March 2011 to January 2012, he remembered he had been in jail on two separate occasions for a total of approximately two months.

Father also testified about a visit with the child in January 2012. On this occasion, the guardians brought the child's clothing, toys, and some food. Father admitted that on earlier visits the guardians "probably brought some medicine," but he claimed the guardians had not brought the child's medication for this visit. Father was not then aware that the child had been diagnosed with asthma or that the child had breathing problems. The guardians also left some guardianship papers for father but he did not want to sign them before seeking legal representation. A few days into the visit, father texted the guardians and said, "thanks for what you've done for me, but I got it from here." By his statement, father meant he did not need anyone to care for the child and he was prepared to do so for the rest of the child's life. During the visit, the child developed a fever and was taken to the hospital. The doctors told father that the child had asthma. Before that time, father never knew the child had a breathing problem and on other occasions the child never had any breathing problem. According to father, while the child was hospitalized, the police came to the hospital and told the father that he had to return the child to mother or he would "go to jail or something." The police escorted father out of the hospital. Father was served with some documents indicating there was going to be a court hearing. Following the child's hospitalization, mother obtained a court order granting her custody of the child. Father did not recall if he was incarcerated at the time of the court hearing, but if he was not present in court it was because he was incarcerated.

b. **Mother's Testimony**

When mother was seven and a half months pregnant she met the guardians, A.N. and J.N. A.N. said she would help mother "get back" on her feet. At that time mother was living with a friend. After the child was born in December 2010, mother continued to live with her friend for several weeks. On January 8, 2011, mother and the child moved in with the child's father, and they lived together as a family for three or four months. Mother received CalWorks assistance in the form of cash (between $540 and $560) and food stamps ($350). She was not required to attend school in order to receive

7

the public assistance. But, she would eventually have to go to work in order to keep receiving public assistance.

In mid-March of 2011, mother and the child moved in with the guardians in their home. After mother moved in with the guardians, things started to change. Mother had gotten a job as an exotic dancer. She worked almost every night, and she was gone from 3:00 p.m. to 3:00 a.m. She took a lot of naps during the daytime. She could not do "as much of the stuff" that she wanted to do with the child as she had been doing before she moved in with the guardians. Mother did not recall much of her time spent with the guardians between March 2011 and October 2011. She remembered that during that time she was going back and forth between a friend's apartment and the guardians' home. She would drop in at the guardians' home and leave again. She "always came back when something was wrong," but not to take control of the child.

When mother applied for CalWorks assistance, she reported she was living with the guardians and she was paying $200 per month for her lodging. She "tried" to give the money to A.N. every single month that she received assistance. She also used food stamps to pay for the child's food. When mother was at the guardians' home, she took care of the child together with A.N. and A.N.'s other children; "we kind of all [took] turns." Mother slept on a couch in the living room. The child slept in a bedroom with A.N. A.N. would not allow mother to sleep with the child because A.N. wanted the child to be on a schedule and it would be better if the child got used to staying in a bedroom instead of the living room. Mother did not take the child to her friend's apartment because A.N. did not like the place and would not allow the child to be there. However, on certain days when A.N. did errands, she left the child with mother at the friend's apartment. When the child "was little," mother attended four or five of the child's medical appointments arranged by A.N.

At the end of May 2011, mother stopped working and she never got another regular job, where she went to a place of employment, got a paycheck, and came home. Instead, she advertised over the Internet to provide personal services and she had "under-the-table jobs," such as house cleaning. From the end of May 2011 to October 2011,

8

mother had the child with her for "probably about three and a half weeks." At the beginning of October 2011, mother permanently moved into an apartment with a friend.

From late December 2011 to January 2012, mother left for a month or so and did not see the child. Mother "needed to get away. It was personal." Mother stayed in touch with the guardians for "the first 5 or 6 days and then [she] just . . . lost contact of everything. [She] didn't have a phone . . . [or] social networks." The guardians ultimately notified mother that father was trying to take the child and that the child was very sick. Mother rushed back, filed some court documents, and she was granted "full" custody of the child. A.N. helped mother fill out the paperwork for the custody order. After she got custody of the child, mother resumed living in the guardians' home. Mother stayed there "only for a month or so." Mother and everyone else in the guardians' house took turns caring for the child. After mother moved out, she continued to see the child on an almost daily basis. A.N. would bring the child to mother's apartment and sometimes the child would stay for a few days or a few hours while A.N. did errands.

In mid-April 2012, mother moved into an apartment with two friends. Mother paid $200 towards the rent on the apartment and contributed $150 in food stamps. Mother eventually moved again. Mother asserted that "[a] few times," she asked the guardians if she could have the child back with her, but they said no because mother "was unstable." The guardians said they would consider mother stable if she got a job or went back to school and had a place; mother "needed to be doing something productive." Mother saw the child on Mother's Day in May 2012. Between mother's last April visit and the Mother's Day visit, she stayed in contact with the guardians through phone calls or text messages. Thereafter, during the months of May and June 2012, the guardians facilitated mother's visits with the child. A.N. would "kind of just bring" the child to mother, or A.N. would call ahead to let mother know she was coming so they could meet. After mother "tried to get" the child back, "that's when everything flipped." Mother and A.N. were no longer on the same level of "understanding." However, A.N. never said that mother's time was up and she was not going to let mother get on her feet. According

9

to mother, A.N. always tried to help mother and pushed her to go forward. Mother never said she was not going to try any more.

### c.     Guardian A.N.'s Testimony

A.N. testified that at the end of October 2010, she and her husband, J.N., met mother. At their initial meeting, mother was seven months pregnant and homeless. Mother had no means to provide for the child and she asked A.N. for help. The guardians helped mother by asking for public donations, A.N. assisted mother in applying for any public assistance for which she was eligible, and A.N. then purchased everything else that mother needed. The guardians were present at the birth of the child in December 2010. According to A.N., immediately after their discharge from the hospital, mother and the child went to live with the guardians.

In January 2011, mother and the child moved into an apartment with the child's paternal aunt, and, according to A.N., the child's father was "in and out." A.N. spoke with mother every day, sometimes several times a day. In February 2011, the guardians had a week-long visit with the child at the guardians' home. For that visit, mother provided a letter of authorization, allowing A.N. to arrange for the child's medical care in mother's absence.

In mid-March 2011, the guardians took the child to their home for another visit. At that time A.N. saw that the three-month-old child was "incredibly overweight," "having a difficult time breathing and laying down," and "terribly" fussy. A.N. discussed her observations of the child with mother, who said the child was "fine." For that visit, mother again provided a letter of authorization, allowing A.N. to arrange for the child's medical care in mother's absence. The visit was intended to be for seven days. However, the child resided with the guardians since that time. A.N. further testified that while the child resided in the guardians' home, the child's paternal aunt called and said she and mother had gotten into a fight, the aunt had thrown out things belonging to mother and the child, and mother could no longer live there. Mother then contacted A.N. and confirmed that she had a fight with the child's paternal aunt and mother could not go back. Mother asked A.N. to keep the child but indicated she would be coming back for

10

the child soon. Mother continued to stay in touch with A.N. for several days but then A.N. lost contact with mother.

Sometime in April 2011, A.N. learned mother's location. A.N. invited mother to return to the guardians' home. Mother had no plans for taking custody of the child. Mother stayed with the guardians for only eight or nine days. During that time, A.N. assisted mother in getting her public assistance reinstated and enrolling for school courses to start in the Fall of 2011. Mother again provided a letter of authorization, allowing A.N. to arrange for the child's medical care in mother's absence. Mother updated the authorization letter when her telephone number changed. Mother went to the child's medical appointments on three or four occasions. According to A.N., mother just assumed the guardians would care for the child. When asked if mother had bought things for the child, A.N. testified that mother bought the child a shirt on one occasion, some diapers in April and May of 2011, and a little car to ride for the child's first birthday (December 2011). Mother thanked the guardians for taking care of the child. Mother also talked about going to school, getting a job, and getting her own place, but those things never happened. A.N. thought of mother as a daughter and A.N. tried to give motherly guidance. When questioned about a document filed in court in which A.N. had indicated that mother "would purchase $200 or more of food for the home which we accepted as her $200 rent," A.N. testified she had been fine with that arrangement. In fact, mother paid only $50 on two occasions and $100 on two occasions during the months mother was staying with the guardians. A.N. never sent either parent a written demand for money for the child.

From May 2011 until June 2011, mother lived in an apartment with friends. There was a three-week period in May 2011 when A.N. asked mother to care for the child in mother's apartment. Mother kept the child in her care without A.N.'s help for five days. During the five days that the child was with mother, A.N. went to mother's apartment every day to give mother whatever she needed for the child. When mother returned the child to A.N. mother said she was having "another problem," and "she couldn't be a mother." Mother was asked to leave her friends' apartment in June 2011, and the

11

guardians allowed mother to move back to their house. Mother lived with the guardians from June 2011 until October 2011.

A.N. also explained the circumstances that led to mother moving out of the guardians' home in October 2011. Mother was drinking and smoking marijuana; she was coming home high all the time, she was always on the telephone, and she wanted to be somewhere else. While at the guardians' home, mother on occasion spent time with and fed the child. However, mother was not the child's primary caretaker. Mother did not make the child's meals and she did not care for the child when the child had tantrums or woke in the night. At the end of September 2011, mother started to spend time at a friend's apartment and by October 2011, mother said she would be moving out to stay with a friend. Mother did not make plans to take the child with her and she did not state that she wanted the child with her. Mother did desire to see the child. After mother moved out of the guardians' home, A.N. arranged for mother to see the child almost every day. During those visits, mother would sometimes spend all day with the child while A.N. did errands and the child was with mother every Saturday for three hours while A.N.'s other children participated in bowling leagues.

Mother lived with her friend from October 2011 to April or May of 2012. During that time mother never asked to have the child live with her. Mother did not offer to provide any money for the child until November 2011. At that time, A.N. told mother that she (mother) needed to give A.N. the "county assistance" money that mother was receiving because she had a child. A.N. and mother agreed that mother would give A.N. $50 a month. Mother said she could not give more because she would not be able to pay her phone bill and rent. According to A.N., mother gave her money on three or four occasions.

A.N. also testified regarding father's contact with the child. From the time that the child was in the care of the guardians through the next 14 months, father spent time with the child on fewer than five occasions. During 2011, the child's paternal relatives also spent time with the child on fewer than five occasions. A.N. did not remember the father ever being present for a visit after March 2011 except for a visit in January 2012. A.N.

12

recalled that on three or four occasions, the child's paternal aunt had called and asked to see the child. The child spent a weekend (Friday to Sunday) with the paternal aunt, a day for a party, and on one occasion, the father picked up the child at J.N.'s work, and had a visit for two days.

A.N. also described certain incidents that occurred in January of 2012. During that month, the child's paternal grandmother asked the guardians to apply to be the child's legal guardians. The guardians prepared the necessary legal documents for the parents' signatures. During a requested four-day visit that month between the child and father at the home of the paternal grandmother, the guardians gave the guardianship papers to father. Father asked if he could contact an attorney before he signed the papers and the guardians told him that he should do so. A.N. was not comfortable leaving the child for the visit, but she did so because she was trying to make sure that the child still saw the paternal grandmother. Mother was "missing at that time" and A.N. did not know where mother was, and the paternal grandmother was concerned. A.N. provided father with the child's inhaler and asthma pill medication. Mother had previously informed the paternal relatives that the child had been diagnosed with asthma. Two days into the four-day visit, father contacted A.N. and said, "I've got this," and he did not return the child to the guardians. The paternal grandmother informed A.N. that A.N.'s request for legal guardianship had scared father and he wanted to try to step up as the child's father, and the paternal grandmother would support father. A.N. called father and asked the father "what about" the child's clothes and medicine. Father said the child did not need those things, that the child just needed father, and father hung up.

The guardians next saw the child four weeks later in February 2012. While in father's care, the child had an asthma attack and was taken to the hospital. The child was diagnosed with a respiratory infection due to asthma exacerbation. A social worker called both mother and the guardians to inform them that the child had been hospitalized. During the child's hospitalization, mother sought and secured an emergency protective court order and a court order granting her sole legal and physical custody of the child with no visitation to father. At the court hearing, mother asked the court if A.N. could

13

have joint custody or guardianship of the child. The court explained that mother would need to file different documents for that relief. The hospital discharged the child to mother's custody, and both mother and the child went to the guardians' home. Mother stayed for approximately five days, and then left without taking the child. Mother did not say when she was returning and she did not discuss any plan for when she was going to come back and take the child. According to A.N., after the child was discharged from the hospital in February of 2012, the child did not see father again until November 3, 2012.

During the next four months (February 2012 through the end of June 2012), mother saw the child on a few occasions. On four occasions over the course of February and March, mother would accompany A.N. and the child while A.N. did errands. In April 2012, mother saw the child on one occasion for a few minutes in a parking lot. Mother next saw the child on Mother's Day in May 2012. A.N. did not see mother again until the date of the guardianship hearing on July 3, 2012. A.N. testified that between Mother's Day in May 2012 and July 3, 2012, the guardians did not hear from mother, with the exception of a telephone call on June 28. Mother called to say she was not going on a planned vacation with the guardians and the child.

A.N. explained the circumstances leading to the guardians' decision to secure legal guardianship of the child. A.N. testified her initial arrangement with mother was that A.N. would take care of the child until mother got back on her feet. There was no date that mother "should get it together by;" mother had ideas about what she wanted to do and the guardians were willing to help. When asked if there was some point in 2012 when A.N. basically agreed time was up, A.N. testified that at the end of June 2012 "we decided time was up." Mother had not seen the child during that month. Mother had called once or twice to discuss with the guardians a planned trip to Disneyland at the end of June, which mother was supposed to attend with them. On June 28, the night before they were leaving, mother called and said she was not coming. Mother said when the guardians came back from the trip, mother wanted custody of the child, asserting she had "two houses and two jobs," and they would be fine. The guardians decided that when they returned home, they would contact Child Protective Services (CPS) and turn over

14

the child to CPS. Mother had been making threats to kill herself, she had made past threats to kill the child, and she had made threats to kill A.N. Following a discussion with CPS representatives, the guardians were advised to file for legal guardianship of the child as it would be less traumatic for the child if the child could remain in the guardians' home. Nonetheless, on July 1, 2012, the guardians called the county's child center and spoke with the social worker on call to arrange for someone to come to the house to discuss the child's situation. While the guardians were waiting for someone from the child center to come to their house, the police arrived at the house. The police were responding to mother's complaint that the guardians had kidnapped the child and mother wanted the child. After speaking with the police, the guardians were allowed to retain custody of the child. Mother was arrested at that time for outstanding warrants in a few different counties.

On July 2, 2012, the guardians filed a petition for appointment as legal guardians of the 18-month-old child. The guardians sought permanent guardianship because mother "was constantly leaving," father "was never around," and no one else was financially supporting the child.[5] A.N. was "just tired of the back and the forth and the limbo and [the child] was starting to understand things and it was getting very confusing and they were becoming violent and abusive . . . [a]nd [A.N.] just didn't want to deal with this anymore. [A.N.] wanted to have consistency and structure and some peace of mind for everybody . . . ." When mother came to the guardians' home it was "just like a visit," "like dropping in," and then she would leave again. A.N. believed mother thought she could come back to the guardians' home whenever she had no other place to go; mother treated the guardians' house as "home base." Whenever mother was "down," the

---

[5]    On cross-examination, when asked what six-month period mother left the child with the guardians with the intent to abandon, A.N. testified she did not think that by filing the petition to free the child from parental custody that she made "a claim of that kind." When reminded of the petition's allegations, and again asked what six-month period applied, A.N. said mother did not financially support the child from the time the child was born in December 2010 to November 1, 2011, and father never gave any money.

15

guardians would help her and let her return to their home, but it was not for the purpose of mother taking control of the child. When asked to summarize the child's daily routine before the legal guardianship proceedings were commenced, A.N. explained she took care of the child "all the time," during the time that mother was around mother did not actively participate in taking care of the child, mother would put the child to bed at night only if A.N. asked her to do so, and mother did not know the child's favorite foods.

### d.        Guardian J.N.'s Testimony

J.N. testified that during 2011 he took the child for visits with the child's paternal relatives on three occasions. The child was brought to the homes of either the child's paternal grandmother or the child's paternal aunt. The child's father was not present when J.N. brought the child for visits. J.N. did not ask either parent to pay any money for the care of the child during 2011. Nor did J.N. ask mother for any money during 2012. J.N. testified mother paid "something a couple of times," but J.N. did not know the exact dollar amount and there were no regular payments of money from mother.

### e.        Child's Paternal Grandmother J.S.B.'s Testimony

J.S.B. testified she saw the child on the day of the child's birth. She also recalled seeing the child "two to three times a month" in 2011 after March or April of that year. Some of the visits were at J.S.B.'s home and some were at the home of the child's paternal aunt. Sometimes father was present and sometimes he was not present. According to J.S.B., father was incarcerated for some of the time, but if he was out of custody father was with the child during visits. Both J.S.B. and father took care of the child, but father basically cared for the child.

J.S.B. further testified she had spoken to the guardians about their care of the child, but J.S.B. never said the child's parents could not take care of the child. J.S.B. also discussed the subject of a legal guardianship with the guardians, but J.S.B. denied ever asking the guardians to seek legal guardianship of the child and J.S.B. never agreed to a legal guardianship because that was a decision to be made by father.

J.S.B. explained the circumstances leading to the child's hospitalization in February 2012. The guardians left the child for a visit for several days in January 2012,

16

but they did not leave any asthma medication for the child. The child stayed "longer than expected," and neither J.S.B. nor father knew anything about the child's medication. The child got sick and was taken to the hospital.

At the conclusion of the testimony, and following argument by counsel, the trial court tentatively ruled the guardians had met their burden of demonstrating that the parents had abandoned the child.

### 2. Evidence of Termination of Parental Rights in Child's Best Interests

After tentatively ruling the parents had abandoned the child, the court considered evidence regarding whether termination of parental rights would be in the child's best interests. During this phase of the trial, the court heard testimony from the child's parents, the guardians, and Richard Wishnak.

#### a. Father's Testimony

Father was questioned about his current knowledge of the child's medical issues. He knew the child had a speech therapist, but he did not know the child was also seeing an occupational therapist, an early intervention specialist, and a psychologist. Father was also questioned about his contacts with a CPS worker. He had received a call from the CPS worker. Father returned the call but no one ever returned his call.

#### b. Mother's Testimony

Mother was questioned about her current knowledge of the child's medical issues. She, not unlike father, did not know the child was seeing an early intervention specialist. She knew the child was seeing an occupational therapist, a speech therapist, and a psychologist, albeit she did not know the names of the therapists or the psychologist. At six months of age the child was diagnosed as suffering from asthma. Mother told the father the child might have asthma because of the child's breathing. She testified father knew about asthma, because mother and father's niece and nephew suffered from it. Since the filing of the guardians' petition to free the child from parental custody, mother had taken a few parenting classes.

Mother never threatened the guardians or harmed the child. After reviewing a July 1, 2012, application filed by the guardians for an emergency protective court order

17

against her, mother testified she did not make the statement attributed to her in the application that she "would kill to get her baby back."[6]  Mother actually said "you have to kill me in order to take my baby from me."  Mother further admitted that on July 1, 2012, she was arrested for "some warrants," "one was for a ticket and one was for an old prostitution case."

Mother was also questioned about her contacts with a CPS worker.  Mother had made an appointment to see the CPS worker but she could not keep the appointment.  Mother also spoke with the CPS worker about a report that mother had physically harmed the child.  Mother was not upset when the CPS worker told mother that there were photographs showing the harm done by mother.  However, the CPS worker's report indicated that mother was angry about CPS's possession of pictures of the child's injuries; mother claimed the guardians were building a case to keep her baby.  Mother did not recall that the CPS worker offered to provide services including a long-term treatment program for mother.

### c.  Guardian A.N.'s Testimony

A.N. testified that at the time of the trial she and J.N. had been married for 19 years.  She was questioned about an incident of spousal abuse that took place some 16 years earlier in 1997, when the guardians had been married for three years.  A.N.'s stepmother, an attorney, prepared and filed an application for a restraining order in favor of A.N. and the guardians' then two-and-one-half-year-old child and against J.N.  The application described incidents where J.N. had thrown items at A.N., and on at least one occasion, J.N. had said he was going to break A.N.'s neck and he had grabbed A.N. at the

---

[6]  The application for an emergency protective court order and the emergency protective court order (one document) was admitted into evidence.  In the July 1, 2012, application, the guardians sought an emergency protective order for themselves and the child against mother based on the following events reported by A.N.:  "[Mother] has given temporary custody of [the child] for the past 15-16 months.  This morning, [mother] showed up at the [guardians'] residence unannounced.  As a result, [mother] was arrested for outstanding warrants.  Additionally, I learned that [mother] made a comment to another friend (who was interviewed) that [mother] would kill to get her baby back."

back of her neck. A.N. confirmed the incidents described in the application had taken place. She explained that at the time she signed the document she did not read it and thought she was signing a document to secure a legal separation. When the parties appeared in court, A.N. asked the judge not to issue the restraining order and no restraining order was issued. After approximately two weeks, A.N. moved back into the house and since that time there had been no other incidents during which J.N. threatened A.N.

A.N. was also questioned about her response to a question in her July 2, 2012, confidential guardian screening form submitted for guardianship of the child. In that form, A.N. stated she was not aware of any reports alleging any form of child abuse made to any agency including CPS involving her or any other person living in her home. A.N. explained that in 2011 she slapped the leg of one of her children (E.N.) and the child reported to a school teacher that A.N. had beaten E.N. A.N. did not remember why she had slapped E.N. and the incident never occurred again. A.N. recalled that following this incident, a man came to her home and spoke with her, J.N., and E.N. Believing that the man was from the school, A.N. spoke to him for several minutes. A.N. was not aware the man was investigating a child abuse allegation as it was never suggested she had abused E.N., "those words were never used," and she was not aware there was ever any type of report issued by CPS. A.N. was never served with any legal papers, she was not placed under arrest, she was never given any indication that she was under a law enforcement examination, and nothing further happened regarding the incident. After CPS investigated the incident, CPS did not open a case as E.N.'s allegations were found to be "unsubstantiated." When asked if she ever spoke with E.N. about the incident, A.N. testified E.N. got into trouble at the school for making a false allegation.

A.N. testified regarding the child's circumstances. She explained the child had a central processing disorder in that the child's nervous system did not always send the correct message to the brain so the child did not always know how to tolerate certain situations. The child "often gets isolated. [The child] wants to be left alone. [The child] screams very loudly. [The child] will often hit [the child]." However, the child was

19

never diagnosed as autistic or being on the autism spectrum. The child was working with an occupational therapist, a speech therapist, a case worker from the North Bay Regional Center, and the child saw a psychologist once a month to deal with behavioral issues. A.N. had disciplined the child by slapping the child's leg on a few occasions. She would "swat" with her hand on the heavy part of the child's thigh. She never left a mark and she did not slap with the intent to cause the child any pain. The last time she slapped the child was August 2013, and the child did not cry after being slapped. A.N. had taken and was currently taking parenting classes which counseled her to refrain from the use of physical discipline. During group meetings, there was some suggestion of the use of a "swat" on a child's hand, thigh, or the backside, as a form of discipline. However, A.N. learned such discipline was not effective for the child so A.N. used other forms of discipline, such as making a direct command and then following through with a time out to allow the child to follow the command. The classes taken by A.N. had taught her ways to handle the child and generally she was able to work in positive ways to discipline the child. None of the specialists that worked with the child had reported A.N. for swatting the child's leg.

### d. Guardian J.N.'s Testimony

J.N. was questioned about A.N.'s filing of an application for a restraining order in 1997. He did not recall the details other than what he read in the application for the restraining order. He was "pretty sure" that the court had not issued a restraining order as the guardians walked into court and said they did not need an order. He recalled that at that time, he and A.N. had been separated for a short time, and there had been a discussion about his attending an anger management class but he could not remember if he had ever attended such a class. Since 1997, there had been no behavior similar to what was written in the application and he had not physically reacted to his children in anger. As to the CPS allegation that A.N. had slapped one of their children, J.N. thought the matter was a "nonissue." He remembered only that a man came to the house and left a card, J.N. had called the telephone number on the card, left messages, and never got a return call. There was no allegation of child abuse directed against J.N.

20

Responding to questions regarding the use of corporeal punishment, J.N. recalled that on one or two occasions he may have "swatted" the child on the child's backside while the child was wearing jeans. J.N. opined it was not discipline per se but more to get the child's attention because the child tended to get lost and acted out or misbehaved. J.N. could not recall the most recent time he had swatted the child. He had not done so since the guardians understood the child's needs and the child's reaction to the swatting. When asked why he was in court seeking another child, especially one that had disabilities, J.N. replied, "Because I love [the child]."

Parents' counsel also questioned J.N. about his relationship with his child (B.N.), who was raised by B.N.'s paternal grandparents. At the time of the trial, B.N. was an adult. When B.N. was two years of age, the court issued a order granting J.N. and B.N.'s grandparents joint custody, which order remained in effect until B.N. was 18. J.N. agreed to joint custody because he was then barely 20 years old, he only had two part-time jobs, and he did not have the mental capability to parent B.N. as a single parent. As B.N. got older, J.N. never sought full custody because he had unlimited visits, he had made an agreement with his parents that he would not seek full custody of B.N., the grandparents were taking care of B.N. "99 percent of the time," and removal from the grandparents' custody would have been detrimental to B.N.

e.      **Richard Wishnak's Testimony**

Richard Wishnak was appointed by the court to perform an adoption evaluation of the child; his report was filed with the court but not admitted into evidence. Wishnak did not speak with mother before he completed his report, but mother called Wishnak after he had already submitted his report to the court. Wishnak advised mother to talk to her attorney and to come to court. During their brief telephone conversation, mother asked Wishnak for advice. They did not discuss Wishnak's recommendation to the court.

Wishnak was also questioned about the information in his report regarding the guardians' petition. Most of the information recited in the report came from the guardians. Wishnak ran a "CLETS" criminal background check regarding the guardians, as well as mother and father. Wishnak did not get back any information about the

21

guardians, but he did receive some information about father and mother. Following the submission of his report to the court, Wishnak received a CPS report concerning the child.[7] Wishnak recalled that the CPS report, written within the last three years, seemed to reflect his impressions after interviewing the guardians in the presence of the guardians' two older children and the child. According to Wishnak, the guardians were a "[s]table couple, worked very hard to raise their own [children], have made efforts to assist others in the community and seemed to be providing . . . a very good home for th[e] child." Wishnak did not recall if either guardian volunteered that A.N. had applied for a restraining order against J.N., or that mother had custody of the child under a family law court order. In response to a question about the use of corporeal punishment on the child, the guardians stated they used such punishment as little as possible, they tried not to do so, and they used alternative disciplinary methods as much as possible. Wishnak did not recall the guardians' responses to whether either of them had an alcohol or substance abuse problem. Wishnak believed the case was difficult because normally the cases he handled concerned "truly absent parents, who . . . aren't there. There's no contact . . . or little or no effort with the child." "When you have a young couple, like with the biological parents, with the parent in the picture, it just automatically makes it a difficult case, so it's emotional. It's more complex." However, none of the parties questioned Wishnak about his recommendation in his report regarding how the court should resolve the guardians' petition.

### 3. Trial Court's January 23, 2014 Amended and Final Order[8]

In its amended and final order, the trial court made the following findings:
"[¶] 1. The conduct and behavior of the birth parents . . . constituted 'abandonment' of the minor child . . . as explained in the Findings set forth . . . below. [¶] 2. This conduct and behavior includes, but is not limited to, the following facts: [¶] a. The [parents] did

---

7    The CPS report was not admitted into evidence.

8    Before issuing its amended and final order, the trial court considered the objections of the parents' counsel to a proposed order incorporating a statement of decision, which was submitted by the guardians' counsel.

not actively exercise or assert their rights to custody of the minor child except that mother obtained a custody order only upon urging and assistance from the [guardians] to facilitate the continuation of the [guardians'] care of the child; and an attempt to exercise custodial rights in July of 2012; [¶] b. The [parents] did not provide financial support for the minor child except for a total of approximately $350 upon the demand of the [guardians] in November of 2011; [¶] c. Having received public assistance based on her status as the mother, mother failed to use those funds for the benefit of the child or to help the [g]uardians; [¶] d. Each [parent] had significant and prolonged periods of non-contact and non-communication with the child between the birth of the child [in December 2010] and the granting of the guardianship on July 3, 2012. [¶] 3. Finding that the legal standard for 'abandonment' is fluid and not a hyper-technical [one], the court finds that the facts adduced at trial are properly interpreted to conclude that: [¶] a. The [parents] left the minor child in the care and custody of the [guardians] for a period of five months or more without communication; and, between several periods of two to three months of no contact, the contact by mother or father was a few hours to a few days. [¶] b. The [parents] failed to provide support for the minor child for periods of six months or more; and; [¶] c. The [parents] intended to abandon the child. [¶] 4. It will serve the welfare and best interests of the child to be freed from the custody and control of the [parents] so that the [guardians] can provide [the child] with the stability and security of an adoptive home, in the absence of those conditions being available from the [parents.] [¶] 5. The court considered all time periods from the date of birth of the child to the filing of the Petition in consideration of this Order."

In a section entitled, **<u>Findings regarding Abandonment,</u>** the trial court found father had abandoned the child in 2011 and termination of father's parental rights was appropriate for the following reasons: "During 2011 there was an extended period of time in excess of six months when father had one brief contact with the child. The testimony indicates that the contact was for less than a day, and that there were two other contacts during 2011 not within the six month period. [A.N.] testified that the child visited [the] paternal grandmother's home no more than five times in that year. Her

testimony directly contradicted father's testimony that he saw [the child] two to three times per month in 2011. According to Father's testimony he was incarcerated for one or two months in the summer of 2011 and did not have contact with the child during that time. The testimony indicates that Father saw [the child] in March 2011 and next saw [the child] around September 2011." The trial court also found mother had abandoned the child and termination of mother's parental rights was appropriate for the following reasons, in pertinent part: "At trial Mother argues that her time at the [guardians'] house was an effort for frequent and continuous contact with the child, and bonding with the child. However, sudden arrivals and sudden departures leave this court to believe that her purpose for going to the [guardians] was for refuge, and for her own personal needs. Her sudden departures without notice and without leaving information about where she was going, or what she was doing, for extended periods of time imply that during this time she had no intention of reunification with her child, or having a stable relationship with [the child]. Her departures can be characterized as disappearances. . . . There is evidence in the record that during these disappearances she had no contact with [the child] and made no effort to reunify. . . . [¶] . . . The testimony showed that the child was fed, cared for and nurtured daily by the [guardians], and only occasionally did mother participate. [¶] During the nine month period from the end of September 2011 and July of 2012, Mother had three very short encounters with [the child]. The testimony shows that Mother was present for a few days in January 2012 during a hospital emergency involving the child. The [guardians] were there to meet the child's needs and transport mother. Mother went to the hospital at the urging of the [guardians] because the child was in danger after being in father's care. There was a short 5-day visit in February 2012, one brief visit in April 2012 for a few hours, and a brief visit on Mother's [D]ay that year. This court finds that these were token visits. A reasonable inference can be drawn that while the [guardians] took the lead in all matters, Mother was mostly disinterested. [¶] It is also important to note that the child has not left the home, or care, of the [guardians] since March 2011, except for a few days in January 2012 when he stayed with father and ended up in the hospital with a serious illness. [¶] Mother was also

24

assisted by [A.N.] in enrollment in a special state program which provided her with living expenses for Mother and [the child]. However, [mother] contributed none of those living expenses to the care of [the child]. The evidence shows she spent the money on herself with less than $350 in contributions over the entire time since birth for [the child]. Mother and Father's attorney asserted that the [guardians] never demanded money from Mother or Father. The testimony of [A.N.] contradicts that assertion: [¶] Q. Did [mother] ever offer you any money for any of [the child's] needs? [¶] A. Not until November when I told her that she was receiving money from the county and that she has never given me anything *and that she needed to give me the money she was receiving*. [¶] Q. November of what year? [¶] A. 2011. [¶] Q. And so now was that . . . the period she was no longer living with you? [¶] A. She was not living with me at that time no. [¶] Q. So you were asking her for the money that was for? [¶] A. I was asking her to give the child the money she was receiving from the county. [Citation.] [¶] The [guardians] have been the only day-to-day caregivers and financial providers of this child from early 2011 to the present. [¶] Mother secured several living situations with other persons. . . . She did not demonstrate that she made an effort to make a place for [the child] to be with her. The inference from all of the evidence is that Mother, at least for a while, recognized that the only stable and safe home for the child was with the [guardians]."

The parents' timely appeals ensued.

## DISCUSSION

### I.     Applicable Law and Standard of Review

The proceeding under review was brought pursuant to Part 4 of Division 12 of Family Code (§ 7800 et. seq.), which was enacted "to serve the welfare and best interests of a child by providing the stability and security of an adoptive home when those conditions are otherwise missing from the child's life." (§ 7800.) Mother argues that in construing the law, "every intendment should be made in favor of maintaining the natural relation of parent and child." In support of her argument she cites to *In re Gano* (1958) 160 Cal.App.2d 700 (*Gano*), in which the court stated, without citation to any cases, that it was familiar "with the general rules set forth in the cases cited by appellants and more

25

particularly with the fundamental principle that in an adversary proceeding of this kind (predecessor adoption statute), every intendment should be made in favor of maintaining the natural relation of parent and child." (*Gano, supra*, at p. 704.) However, shortly after *Gano* was decided, our Supreme Court specifically disapproved of the aforequoted portion of *Gano*, sub silento. (See *Adoption of Barnett* (1960) 54 Cal. 2d 370, 377-378.) Thus, the applicable rule "is that the adoption statutes are to be liberally construed with a view to effect their objects and to promote justice. Such a construction should be given as will sustain, rather than defeat, the object they have in view. The main purpose of such statutes is the promotion of the welfare of children 'by the legal recognition and regulation of the consummation of the closest conceivable counterpart of the relationship of parent and child.' " (*Department of Social Welfare v. Superior Court* (1969) 1 Cal.3d 1, 6, quoting from *Adoption of Barnett, supra*, 54 Cal.2d at p. 377; see *San Diego County Department of Public Welfare v. Superior Court* (1972) 7 Cal.3d 1, 15.)

The statutory scheme (§ 7800 et. seq.), which "shall be liberally construed to serve and protect the interests and welfare of the child," allows for "a proceeding to be brought "for the purpose of having a minor child declared free from the custody and control of either or both parents." (§§ 7801, 7802.) Section 7822 provides that the circumstances under which a Part 4 proceeding may be brought, includes when "[t]he child has been left by both parents or the sole parent in the care and custody of another person for a period of six months without any provision for the child's support, or without communication from the parent or parents, with the intent on the part of the parent or parents to abandon the child." (§ 7822, subd. (a)(2).)[9]

---

[9] "Section 7822 became operative in 1994. (Stats. 1992, ch. 162, § 10, p. 464.) The language that currently appears in section 7822, requiring as a prerequisite for abandonment that a child be 'left' in the care and custody of another person, previously appeared in nearly identical form in former Civil Code section 232, subdivision (a) (Stats. 1961, ch. 1616, § 4, p. 3504), and prior to that, in former Welfare and Institutions Code section 701 (Stats. 1937 ch. 369, § 701, p. 1031). Much of the case law . . . interpreting the meaning of that language was decided under the previous statutory provisions." (*In re Amy A.* (2005) 132 Cal.App.4th 63, 68, fn. 4 (*Amy A.*).)

26

"Although case law refers to the leaving of a child in another person's care and custody as ' " 'an actual desertion' " " by the parent, case law also clarifies that a parent 'leaves' a child by ' "voluntarily surrender[ing]" ' the child to another person's care and custody. [Citations.] Case law consistently focuses on the voluntary nature of a parent's abandonment of the parental role rather than on *physical desertion* by the parent." (*Amy A., supra*, 132 Cal.App.4th at p. 69; see *Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1011-1012 [substantial evidence supported trial court's finding that father left the child as required under section 7822 where the evidence demonstrated that father "voluntarily abdicated the parental role"].) "Accordingly, the statute contemplates that abandonment is established only when there is a physical act – leaving the child for the prescribed period of time – combined with an intent to abandon . . . ." (*In re Jacklyn F.* (2003) 114 Cal.App.4th 747, 754). "Intent to abandon is a question of fact. [Citation.] When the evidence permits the conclusion of only token efforts to communicate with the child, '[u]nless the presumption of abandonment raised by [that] fact has been overcome as a matter of law, the findings and order of the trial court . . . must be sustained.' [Citation.] [¶] . . . [¶] 'Intent to abandon, as in other areas, may be found on the basis of an objective measurement of conduct, as opposed to stated desire.' [Citation.] In determining a parent's intent to abandon, the trial court may consider not only the number and frequency of his or her efforts to communicate with the child, but the genuineness of the effort under all the circumstances [citation], as well as the quality of the communication that occurs [citation]." (*In re B.J.B.* (1986) 185 Cal.App.3d 1201, 1212 (*B.J.B.*).) Thus, "[i]f the parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent." (§ 7822, subd. (b).) "The parent need not intend to abandon the child permanently; rather, it is sufficient that the parent had the intent to abandon the child during the statutory period." (*Amy A., supra*, at p. 68.) And, the sixth-month statutory period need not be the six months immediately preceding the filing of the section 7822 petition. (See *Adoption of Burton* (1956) 147 Cal.App.2d 125, 135 (*Burton*) [decided under predecessor

27

statute Civ. Code, § 224]; see also *In re Connie M*. (1986) 176 Cal.App.3d 1225, 1237, fn. 2 [decided under predecessor statute Civ. Code, § 224, and citing to *Burton*].)

"To terminate parental rights on grounds of abandonment, the trial court must find intent to abandon 'by clear and convincing evidence.' [Citations]. However '[that] standard is for the guidance of the trial court only; on review, our function is limited to a determination whether substantial evidence exists to support the conclusions reached by the trial court in utilizing the appropriate standard.' [Citation.]" (*B.J.B., supra,* 185 Cal.App.3d at p. 1211.)

## II.     Mother's Appellate Arguments

Mother initially argues that the trial court's finding of abandonment erroneously included a time period following the granting of the temporary guardianship in July 2012. In support of her argument, mother relies on the trial court's finding that, "The court considered all time periods from the date of birth of the child to [May 30, 2013,] the filing of the Petition in consideration of this Order." However, as the guardians properly concede, a fair reading of the court's entire findings on the issue of abandonment indicates that the court's determination of the requisite statutory period of abandonment ended before the guardians filed for temporary legal guardianship on July 1, 2012. The court's statement of the time frame it considered in rendering its rulings properly recognized that there were two issues before the court: whether the child had been abandoned for the statutory period, and, if there was an abandonment, whether it was in the child's best interests to free the child from parental custody and terminate parental rights to allow the guardians to adopt the child. As to the latter issue concerning the child's best interests, the court appropriately considered the circumstances of the entirety of the child's life, from birth until the filing of the guardians' section 7822 petition in May 2013.

Mother also challenges, on various grounds, the sufficiency of the evidence to support the trial court's finding of abandonment. She first argues that the amended and final order is reversible per se because the trial court found mother had failed to communicate with the child for "five months," and not the requisite six months as

required by section 7822.  However, in finding the child was abandoned by both parents, the trial court actually stated:  [¶] "a. The [parents] left the minor child in the care and custody of the [guardians] for a period of *five months or more* without communication; and, between several periods of two to three months of no contact, the contact by mother or father was a few hours to a few days. [¶] b. The [parents] failed to provide support for the minor child for periods of six months or more; and; [¶] c. The [parents] intended to abandon the child."  (Italics added.)  Initially, mother's argument fails because section 7822 allows either circumstance (no communication or no support for the requisite six months) to support a section 7822 petition.  (See § 7822, subd. (b) [the failure to communicate *or* to provide support for the requisite six months is presumptive evidence of abandonment; italics added].)  In all events, a fair reading of the trial court's findings, as to the time frame of the parents' lack of communication included "five months or more" without any communication, and, that during an additional period of two or three months of no contact, there was contact by parents for a few hours to a few days.  This reading of the challenged finding is consistent with the court's other findings that "each of the [parents] had significant and prolonged periods of non-contact and non-communication with the child between the birth of the child [in December 2010]. . . and the granting of the guardianship on July 3, 2012;" "[d]uring 2011 there . . . was an extended period of time in excess of six months when father had one brief contact with the child," "there were two other contacts [between father and the child] during 2011 not within the six month period," "[f]ather saw [the child] in March 2011 and next saw [the child] around September of 2011;" and "[d]uring a nine month period from the end of September 2011 and July of 2012," mother had only "token" encounters with the child.

We also see no merit to mother's arguments that there is no substantial evidence to support the trial court's findings that mother had failed to or made only token efforts to contact the child, and failed to provide financial support for the child for six months or more, with the intent to abandon the child.  Relying on certain isolated portions of the testimony at trial and the documentary record, mother argues the trial court should have found she had not failed to and made more than token efforts to communicate with the

29

child, she had provided financial support for the child, and she did not intend to abandon the child within the statutory period. However, on appeal, we do not review the record for substantial evidence that would support a finding of no abandonment, as mother suggests. Rather, our authority is only to determine whether there is substantial evidence supporting the finding of abandonment. "If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.) "*If such substantial evidence be found, it is of no consequence that the [trier of fact] believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.* [Citations.]" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874.) Thus, we must reject mother's "attempt to reargue on appeal those factual issues decided adversely to [her] at the trial level, contrary to established percepts of appellate review." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398-399.) Whether mother failed to communicate or provide support for the child, with the intent to abandon the child, within the statutory period, were "question[s] addressed peculiarly to the trial court which heard [mother's] testimony and observed [her] demeanor at trial," together with the other testimonial and documentary evidence admitted at the trial. (*In re Marriage of Sheridan* (1983) 140 Cal.App.3d 742, 749.) The trial court's "opportunity to observe the witnesses and generally get 'the feel of the case' warrants a high degree of appellate court deference. [Citation.]" (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) Mother's reliance on purported concessions in A.N.'s testimony is similarly misplaced. (See *Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1028 [trier of fact "is not required to believe the testimony of any witness, even if uncontradicted"].) "It is well settled that the trier of fact may accept part of the testimony of a witness and reject another part even though the latter contradicts the part accepted. [Citations.] As [the court] said in *Nevarov v. Caldwell* (1958) 161 Cal.App.2d 762, 777 [327 P.2d 111], 'the [trier of fact] properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus

weaving a cloth of truth out of selected available material.  [Citations.]"  (*Stevens v. Parke, Davis & Co*. (1973) 9 Cal.3d 51, 67-68.)  "[N]either conflicts in the evidence nor ' "testimony which is subject to justifiable suspicion . . . justif[ies] the reversal of a judgment, for it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' [Citation.]"  (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065.)

Nor do we see any merit to mother's argument that the child's best interests are not served by terminating parental rights, thereby allowing the guardians to adopt the child.  Again relying on certain portions of the trial testimony and the documentary record, mother argues the trial court should have found the child's best interests would be served by maintaining mother's parental rights, rather than severing that relationship forever, and, at a minimum, the court should have maintained the guardianship.  However, as we have noted, on appeal we are limited to determining whether there is substantial evidence to support the trial court's finding that it was in the child's best interests to terminate parental rights so that the child could be adopted by the guardians.  We must "accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact."  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)  We see nothing in the record that calls into question, as a matter of law, the trial court's finding that it is in the child's best interests to be free from mother's custody, and to terminate parental rights to allow the child to be adopted by the guardians.  Nor do we see any evidence supporting mother's assertion that the trial court terminated her parental rights "[s]imply because the [guardians] may have more money or be more economically secure" than mother.  The cases cited by mother do not require a different result.

## III.  Father's Appellate Arguments

Father argues there is no substantial evidence supporting the trial court's finding that he "left" the child in the care of the guardians.  According to father, he did not leave the child in the care and custody of the guardians, but rather it was mother who took the child and left home, thereby removing the child from the "physical" custody of father,

and that mother made all of the arrangements for the child to be cared for by the guardians, "[n]one of that was father's doing," and "he had virtually no contact" with the guardians. Father also contends that "the steps he took to maintain his relationship with [the child] after mother left the home in March 2011," precluded the court from finding he had left the child based on his inactions. As we now explain, we see no merit to father's contentions.

We initially conclude the trial court could reasonably find that in March 2011, the child was left with the guardians with the implied consent of the father. After mother removed the child from the physical custody of father, father failed to do anything to regain custody of the child. There is no evidence that he asked mother to return the child or sought a court order for custody of the child. While father testified he did not specifically know the child's location immediately after mother left, father admitted he was in contact with the mother and he could have readily learned, as he subsequently did, that the child was being cared for by the guardians.

We also conclude the trial court could reasonably find that father had "left" the child based on father's conduct after mother left the home in March 2011. Resolving the conflicts in the testimony in favor of upholding the order, as we must, the record demonstrates that during 2011, father's visits with the child were sporadic, occurring on no more than five occasions from March 2011 through the end of December 2011. The father then had contact with the child in January 2012, when father kept the child until the child was hospitalized in February 2012. However, father's custody of the child ended in February 2012, when mother secured an ex parte court order granting her sole legal and physical custody of the child and denying visitation to father. Thereafter, father made no attempt to regain custody of the child or even secure visits with the child until after the guardians had been granted letters of temporary guardianship on July 3, 2012. "The trial court was not required to believe [father's] testimony as to his intent, nor does such testimony of itself overcome the presumption of abandonment as a matter of law. [Citation.] Moreover, even were we to assume that [father's] testimony served to overcome the statutory presumption [citation], the evidence nevertheless is sufficient to

sustain the trial court's determination [citation].)" (*B.J.B., supra*, 185 Cal.App.3d at p. 1212.) On this record, the trial court could reasonably find the child was "left" with the guardians with the implied consent of father, and thereafter, father's sporadic communications with the child through visits from March 2011 through the end of June 2012 (15 months), evidenced that he had voluntarily surrendered his parental role and thus "left" the child within the meaning of section 7822. (See *In re Jacqueline H.* (1979) 94 Cal.App.3d 808, 816 [court upheld finding that the mother "left" her child when she did not seriously attempt to obtain visits or a change in the order removing the child from her custody].)

We also see no merit to father's arguments that there is no substantial evidence supporting the trial court's finding that father intended to abandon the child. Father asserts that any finding of abandonment cannot be based solely on his failure to provide support because no one demanded that he pay support, and therefore, the abandonment finding must be predicated on his failure to communicate during the statutory period. He then asserts he successfully rebutted the presumption of abandonment based on his failure to communicate for the requisite statutory period. He asks us to consider that after mother took the child in March 2011, he stayed in touch with mother and made efforts to see the child. He then argues the trial court's finding that there was a lack of contact by father from March 2011 to September 2011 is not supported by substantial evidence because A.N. conceded there were visits, the child's paternal grandmother testified father was present during those visits unless he was incarcerated, and the court's finding of lack of contact during those times was not supported by "reliable" or "credible" evidence because the court did not find the paternal grandmother lacked credibility and A.N. was not present in the paternal grandmother's home to know whether or not father was present. However, the mere existence of "contact" or "communication" through visits between father and the child did not preclude a finding that father intended to abandon the child. As we have noted, in determining a parent's intent to abandon, the trial court may consider both the number and frequency of the parent's efforts to communicate with the child, as well as the quality of the communications. (*B.J.B.*, *supra*, 185 Cal.App.3d at

p. 1212.)  In finding abandonment based on father's sporadic efforts to contact the child after March 2011 and through the granting of letters of temporary guardianship in early July 2012, the trial court necessarily found A.N.'s testimony was more credible than the testimony of father and the child's paternal grandmother regarding those contacts.  (See Evid. Code, § 411 ["the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact"]; *Evje v. City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 493 [judgment affirmed on testimony of a single witness rejecting argument that testimony was false in light of witness's own documents and admissions]; *People v. Silva* (2001) 25 Cal.4th 345, 369 ["[a] rational trier of fact could disbelieve those portions of defendant's statements that were obviously self-serving"]; *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043 ["credibility is governed by more than just the words transcribed by a court reporter;" "[a] trier of fact is free to disbelieve a witness, even one uncontradicted, if there is any rational ground for doing so"].)  Father's reliance on the trial court's failure to make express findings on the credibility of the child's paternal grandmother is not persuasive.  In rendering its statement of decision incorporated in its amended and final order, the trial court was not required to make express findings on the credibility of the child's paternal grandmother or any other witness.[10]  A statement of decision "need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision.  [Citations.]  '[A] trial court rendering a statement of decision under . . . [Code of Civil Procedure] section 632 is required to state only ultimate rather than evidentiary facts because findings of ultimate facts necessarily include findings on all intermediate evidentiary facts necessary to sustain them.  [Citation.]'  [Citations.]  In other words, a trial court rendering a statement of decision is required only to set out ultimate findings

---

10      The amended and final order included a section entitled, **Credibility of Witnesses,** in which the trial court stated:  "The credibility of witnesses is one of the important and crucial parts of this trial.  All testimony was listened to by the Court.  Pursuant to California Evidence Code section 780, the Court will make findings based on the credibility of witnesses and how much weight to be given to their testimony and opinions."

34

rather than evidentiary ones." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125.) We see nothing in the cases cited by father that supports a different result.[11]

## DISPOSITION

The order, filed on January 23, 2014, is affirmed. The parties shall bear their own costs on appeal.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Siggins, J.

*Adoption of D.R.*, A141387

---

[11]   In light of our determination, we do not need to address father's other contention.